Henry WILLIS, III,
Petitioner–Appellant,

v.

Ralph KEMP, Warden, Georgia
Diagnostic and Classification
Center, Respondent–Appellee.

No. 82–8677.

United States Court of Appeals,
Eleventh Circuit.

Feb. 12, 1988.

---

Millard C. Farmer, Joseph M. Nursey, Atlanta, Ga., for petitioner-appellant.

Michael J. Bowers, Atty. Gen., W. Davis Hewitt, Asst. Atty. Gen., Mary Beth Westmoreland, Atlanta, Ga., for respondent-appellee.

Before TJOFLAT, FAY and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner, Henry Willis III, is a Georgia death row inmate, having been convicted of malice murder and sentenced to death by the Superior Court of Bleckley County, Georgia for the shooting of a Ray City, Georgia policeman.[1] He challenges the district court's denial of his petition for a writ of habeas corpus. In *Willis v. Zant*, 720 F.2d 1212 (11th Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984) (hereinafter *Willis I*), we rejected four of petitioner's eight claims for relief. We concluded that two of the remaining four claims required an evidentiary hearing. While retaining jurisdiction over the appeal, we remanded those two claims to the district court, directing the court to hold an evidentiary hearing on those claims. The district court held the hearing and submitted its findings and conclusions to this court. We can now dispose of the four claims left undecided in *Willis I*.

Petitioner's first claim, which is one of the two claims that we remanded to the district court, is that at trial he was denied his sixth amendment right to a venire representing a fair cross-section of the community because a cognizable group—young adults aged eighteen to twenty-nine[2]—was systematically excluded from the venire. On remand, the district court found that young adults did not constitute a cogniza-

ble group for sixth amendment fair cross-section purposes, and held that any underrepresentation of young adults therefore did not amount to a violation of petitioner's rights under the sixth and fourteenth amendments.

Petitioner's second claim, also one of the claims that we remanded, is that the prosecutor peremptorily challenged all blacks from petitioner's petit jury in violation of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). On remand, the district court rejected this claim, holding that petitioner failed to prove that the prosecutor had engaged in a systematic and intentional practice of excluding blacks from petit juries.

Petitioner's third claim is that prosecutorial misconduct rendered petitioner's sentencing proceeding fundamentally unfair, denying him due process. As we noted in *Willis I*, the district court denied relief on this claim. Petitioner has since abandoned his fourth claim.[3]

We affirm the district court's denial of habeas corpus relief with respect to the claims now before us. We begin with a discussion of petitioner's fair cross-section claim.

I.

The purposes of the sixth amendment fair cross-section requirement are to prevent the improper conviction of defendants by biased or partial juries, promote public confidence in the fairness of the criminal justice system, and ensure that the civic

---

1. Petitioner's criminal conduct and the procedural history of his conviction and collateral attack are set out in Part III of this opinion, as well as in the Supreme Court of Georgia's affirmance of his conviction and death sentence, *Willis v. State*, 243 Ga. 185, 253 S.E.2d 70, *cert. denied*, 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979), and this court's review of the district court's denial of petitioner's application for habeas relief, *Willis v. Zant*, 720 F.2d 1212 (11th Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984).

2. Although petitioner's original claim alleged that the underrepresented group consisted of young adults aged 18 to 30, the evidence presented by petitioner to the district court to

prove underrepresentation was based on census data using the age group 18 to 29. The district court treated this inconsistency as a variance and thereafter construed petitioner's claim as alleging an underrepresentation of young adults aged 18 to 29. We do so also.

3. During oral argument, petitioner's counsel conceded that the fourth claim—that the trial court's instruction and the statutory capital sentencing provision regarding aggravating circumstances were unduly vague—was foreclosed by the Supreme Court's decision in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). He therefore abandoned the claim, and it is no longer before us.

responsibility of jury service is shared by all members of the community. *Taylor v. Louisiana,* 419 U.S. 522, 530–31, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975); *see also Lockhart v. McCree,* 476 U.S. 162, 174, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986). To establish a prima facie violation of the fair cross-section requirement, a complainant must prove

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Once a complainant establishes all three elements of his prima facie case, the government bears the burden of "showing attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 368, 99 S.Ct. at 671.

■ In *Willis I,* we set forth what a complainant must prove to satisfy the "distinctive" or "cognizable" element of a fair cross-section claim. We stated that:

> [t]o show that a group is distinct or cognizable under the sixth amendment, a defendant must show: (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

*Willis I,* 720 F.2d at 1216; *see also United States v. Potter,* 552 F.2d 901, 904–05 (9th

Cir.1977). Because the cognizability of a given group involves the relationship between that group and the community, whether the group is cognizable depends on the time and location of the trial. *Willis I,* 720 F.2d at 1216.

With respect to the cognizability element of his fair cross-section claim, petitioner presented an expert witness, Dr. Abbott L. Ferriss, a professor of sociology and anthropology at Emory University, who testified that young adults across the country generally held views differing from those held by older adults. Dr. Ferriss testified that he had studied national Gallup opinion polls conducted between 1973 and 1978 and had determined that young adults aged eighteen to twenty-nine and older adults held significantly different attitudes on issues such as capital punishment.[4]

Petitioner also asserted that young adults constituted a cognizable group within Bleckley County itself. Petitioner contended that because Bleckley County schools had not been desegregated until 1970–71, "[o]nly the young adults in the community had grown up in a desegregated society; they were the only white group eligible for jury duty who had attended desegregated schools and had an opportunity to socialize with black persons." In support of this proposition, petitioner presented another expert, Dr. John B. McConahy, a professor of political science and psychology at Duke University. Dr. McConahy testified on deposition that, in general, adults who attended racially desegregated schools tend to exhibit less racial prejudice than adults who attended racially segregated schools. Petitioner also submitted into evidence a public opinion survey taken in Bleckley County in 1978 and supervised by Dr. McConahy. Dr. McConahy contended that the results of the survey showed a difference in attitude between young adults aged eighteen to

---

4. Petitioner placed into evidence a paper prepared by Dr. Ferriss in 1977, entitled "Difference Among Age Classes." This paper stated that according to a 1974 Gallup poll, 71% of those polled aged 50 or older, but only 52% of those polled aged 18 to 29, favored capital punishment for persons convicted of murder. A 1976 Gallup poll showed a substantially narrower spread, with 67% of those polled aged 50 or older, and 59% of those aged 18 to 29, in favor of capital punishment for convicted murderers.

thirty and older adults within Bleckley County.[5]

With respect to the underrepresentation element of his fair cross-section claim, petitioner offered evidence showing that while 35.1 percent of the jury-eligible population in Bleckley County fell within the eighteen to twenty-nine age group, only 10.1 percent of the jury pool from which petitioner's petit jury was selected fell within this group—an underrepresentation of 25 percent.[6] With respect to the systematic exclusion element, petitioner offered evidence showing that young adults were consistently underrepresented in Bleckley County

jury pools. Petitioner sought to show that this underrepresentation was attributable to the "key man" system used to select jury members. Petitioner contended that Bleckley County key men were typically older citizens, and the underrepresentation of young adults resulted from the natural propensity of the key men to select for jury duty older adults like themselves rather than younger adults with whom they were unfamiliar.[7]

■ The district court concluded that petitioner failed to establish a fair cross-section violation. Applying this court's definition of cognizability, see *Willis I*, 720 F.2d

5. The 1978 survey was conducted by polling approximately 150 randomly selected residents of Cochran, Georgia—the county seat of Bleckley County. The survey was conducted by a graduate student working under Dr. McConahy. The purpose of the survey was to explore attitudinal differences between young adults and older adults and the effect that such differences would have on jury decisionmaking. The survey was not designed to show whether attendance at racially desegregated schools softened racial prejudice.

The survey contained 27 questions and was designed to compare the responses given by adults aged 18 to 30 with the responses given by older adults above 30. Dr. McConahy testified that the survey results showed a difference in attitude between those two groups on issues relating to crime, race, and capital punishment. For example, 78.7% of the older adults sampled agreed with the statement, "if the prosecution goes to the trouble of bringing someone to trial, they're probably guilty," while only 45.2% of the young adults sampled agreed with the statement. Likewise, only 28.6% of the young adults, as opposed to 62.0% of the older adults, agreed with the statement, "whites are usually more honest than blacks," and only 38.2% of young adults, but 74.7% of older adults, agreed with the statement, "black people have a more violent nature than white people." In addition, 84.3% of older adults agreed with the statement "the death penalty should be used more often than it is," while only 61.9% of the young adults agreed with the statement.

6. The data relating to the population of Bleckley County was taken from the 1970 census, while the data relating to the jury pool was taken from the 1977 jury pool list from which petitioner's petit jury was drawn. Although the district court adopted petitioner's raw data, it disagreed with petitioner's calculations, finding a lower degree of underrepresentation. The district court excluded from petitioner's calculations 946 college students attending school in Bleckley County, finding that these students

were not truly "jury eligible" because they probably would be excused from jury duty. Therefore, the district court found that only 27.6% of the jury-eligible population fell within the age group 18 to 29, yielding an underrepresentation of only 17.5%. Given our disposition of petitioner's claim, we do not decide which calculation is correct.

7. Under the Georgia jury selection system, a board of six jury commissioners is chosen by a superior court judge in each county. These six commissioners are instructed to "select a fairly representative cross section of the intelligent and upright citizens of the county from the official registered voters' list." Ga.Code Ann. § 59–106 (1981). The citizens selected form the jury pool from which petit juries are drawn.

The 1977 jury pool for Bleckley County was drawn by a board of jury commissioners comprised of five white males, ranging in age from 37 to 53, and one black female, who petitioner alleged was older than 30, but whose age is not disclosed in the record. These six commissioners testified at a hearing held prior to petitioner's trial in state court, but were not called to testify at the district court's evidentiary hearing on petitioner's habeas claim. According to the six commissioners, they selected the jury pool by reviewing the name of every person appearing on the most recent Bleckley County voters' registration list. If one or more commissioners knew the person and believed that the person was "upright and intelligent," the name was included in the jury pool. After reviewing all the names on the voters' registration list, the commissioners compared the tentative jury pool to the 1970 census for Bleckley County to ensure that the jury pool reflected a fair cross-section of the county population with regard to race and sex. Any adjustments were made by randomly removing names from the tentative jury pool. The commissioners, however, did not compare the pool to the 1970 census to ensure the pool represented a fair cross-section on the basis of age.

at 1216, the district court held that petitioner failed to prove that young adults aged eighteen to twenty-nine residing in Bleckley County in 1977 constituted a cognizable group. Specifically, the court found that:

(1) 18–29 year old persons in Bleckley County, Georgia, in 1977 were not defined or limited as a group by any factor. The group of 18–29 year old persons had no definite composition such as by race or sex.

(2) While there was some similarity of opinion on matters of public interest among 18–29 year old Bleckley County persons, there was no common thread or basic similarity in attitude, ideas, and experience among such persons.

(3) There was no community of interest in 1977 among 18–29 year old Bleckley County persons such that their interests could not be adequately represented if they were excluded from the jury selection process.

We agree with the conclusions of the district court.

■■■■ The essential characteristic of a cognizable group is its distinctiveness within the community. In other words, a cognizable group, when viewed objectively, is defined or limited by some factor in a manner that sets it apart from the remainder of the community. *Willis I,* 720 F.2d at 1216; *United States v. Potter,* 552 F.2d 901, 904–

05 (9th Cir.1977). Moreover, the group must be internally cohesive, i.e., there must be a common thread or similarity of attitudes binding all members of the group. *Willis I,* 720 F.2d at 1216; *Potter,* 552 F.2d at 904. Finally, these attitudes must not be shared by the remainder of the community, such that the interests of the cognizable group will not be represented if it is excluded from jury service. *Willis I,* 720 F.2d at 1216; *United States v. Musto,* 540 F.Supp. 346, 354–55 (D.N.J.1982), *aff'd sub nom. United States v. Aimone,* 715 F.2d 822 (3d Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984).

In the present case, all that petitioner did was to provide the district court with evidence showing that the views of younger adults differ somewhat from those of older adults.[8] This showing, standing alone, was insufficient to establish that young adults aged eighteen to twenty-nine were a cognizable group in Bleckley County in 1977. Petitioner failed to establish any of the three attributes of cognizability discussed above.

First, petitioner did not prove that the age group he selected was defined and limited such that it represented the community's view of "young adults." Nor did he present any evidence showing that a clear boundary exists between younger adults and older adults.[9] To the contrary, it ap-

---

8. Petitioner also alleged that young adults aged 18 to 29 were a cognizable group because they were the only group to have attended desegregated schools in Bleckley County. As explained below, the district court properly disregarded this evidence in deciding that young adults did not constitute a cognizable group.

Petitioner submitted evidence that the Bleckley County public school system was first desegregated in the school year 1970–71. Assuming that the senior class was desegregated in the first year, and that seniors are 18 years old at the time they graduate, members of the 1971 graduating class would have been 24 years old at the time of the jury pool selection in 1977. The age group of those adults who attended desegregated schools therefore would have been 18 to 24, not 18 to 29. Thus, petitioner's assertion that attendance at desegregated schools created cognizable group status did not support, and in fact contradicted, his argument that persons aged 18 to 29 formed a cognizable group in Bleckley County in 1977.

9. The need for a clear boundary between young adults and older adults was discussed in *Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) (en banc), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). In *Barber,* the court was faced with the argument that young adults aged 18 to 34 constitute a cognizable group. The court rejected this proposition, stating:

In the present case there is simply no evidence in the record for determining that people between the ages of 18 and 34 (as opposed to some other ages) belong to a particular group. The essence of a distinctive group is that its members share specific common characteristics. Yet, what can we identify as the common characteristics of people in an age group that spans a sixteen-year gap, covering such dynamic years in a person's life as those that are encompassed between the ages of 18 to 34? To be sure, they are all younger than people over 34. But what is the evidence that the attitudes and thinking of, say 30 year olds have more in common with 18 year olds than

pears that petitioner chose the age group eighteen to twenty-nine merely because that was the age group used by the Census Bureau and by Gallup to stratify the population, not because that particular group accurately represented the community's view of "young adults." Nothing in the record indicates that within Bleckley County, young adults aged eighteen to twenty-nine were a defined or limited group, i.e., that there was something special about that age group as opposed to other arbitrarily selected age groups, such as eighteen to twenty-five, or even eighteen to thirty-five, that set it apart from the rest of the community.[10] *See Barber v. Ponte,* 772 F.2d 982, 998–99 (1st Cir.1985) (en

banc), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). Therefore, because the age group was not defined and limited with respect to the community, it was not cognizable.[11]

Second, petitioner's group was not cognizable because he did not prove that his arbitrarily selected age group was internally cohesive. Although petitioner did show that on some issues, the collective views of young adults aged eighteen to twenty-nine differed from the collective views of older adults, petitioner did not submit any evidence that persons aged eighteen to twenty-nine shared any common attribute, other than their age.[12]

> they do with 40 year olds, or for that matter, going to the other end of the scale, that 18 year olds have more in common with 28 year olds than with 16 year olds? How do we know that there should not be two groups, 18 to 28 and 28 to 35, or three, or four groups encompassing other boundaries?
>
> *Id.* at 998.

**10.** The inability to define the group "young adults" is shown by petitioner's own evidence. Dr. Ferriss, using Gallup poll statistics, defined young adults as persons aged 18 to 29. *See supra* note 4. Dr. McConahy, using the survey prepared by his student, defined young adults as persons aged 18 to 30. *See supra* note 5. Finally, petitioner, by declaring that young adults were those persons who attended a desegregated school in Bleckley County, defined young adults as persons aged 18 to 24. *See supra* note 8.

**11.** We do not dispute that petitioner's group was "defined" in the sense that the group, as described by petitioner, had definite parameters. Nonetheless, a subjectively definite description is insufficient to "define and limit" a cognizable group for fair cross-section purposes. Rather, petitioner was *required to prove that the group* —"young adults"—was viewed by the community as being comprised of 18 to 29 year olds. Otherwise, the group described by petitioner would not be truly distinct within the community.

We recognize that a complainant attempting to prove that a certain age group is a cognizable group carries a tremendous burden. Unlike race or gender, age is measured along a spectrum or continuum, and is not easily divided into groups. Therefore, it is extremely difficult to prove that there is any one accepted definition of what constitutes, e.g., a young adult. For this reason, most circuits that have addressed the problem of cognizability of age groups have held that, as a matter of law, cognizable groups cannot be created on the basis of age alone. *See, e.g., Barber v. Ponte,* 772 F.2d

982, 1000 (1st Cir.1985) (en banc), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *Davis v. Greer,* 675 F.2d 141, 146 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977); *see also United States v. Musto,* 540 F.Supp. 346, 354–55 (D.N.J. 1982), *aff'd sub nom. United States v. Aimone,* 715 F.2d 822 (3d Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984); *United States v. Blair,* 493 F.Supp. 398, 406 (D.Md.1980), *aff'd,* 665 F.2d 500 (4th Cir.1981); *cf. Brown v. Harris,* 666 F.2d 782, 783–84 (2d Cir.1981) (expressing "sympathy" for the view that age cannot define a cognizable group, but not deciding the question), *cert. denied,* 446 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982). Our circuit has chosen instead to give a complainant the opportunity to proffer evidence in an attempt to demonstrate that a given age group is cognizable with respect to the community. *See Ciudadanos Unidos v. Hidalgo County Grand Jury Comm'rs,* 622 F.2d 807, 817–18 (5th Cir. 1980), *cert. denied,* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981); *Willis I,* 720 F.2d at 1217.

**12.** Although petitioner's evidence indicated that in general the views of young adults differed from those of older adults on certain issues, it also showed that there was no common thread or basic similarity of attitudes among young adults aged 18 to 29. For example, Dr. Ferriss' study showed that in 1976, 59% of adults aged 18 to 29 (as opposed to 67% of those 50 or older) favored capital punishment for murderers. This evidence also showed that attitudes differed among young adults: 59% of young adults were in favor of, *while 41% were opposed to,* capital punishment. *See supra* note 4. Dr. McConahy's survey showed a similar divergence of opinion among young adults. For example, in 1978, 45.2% of adults aged 18 to 30 agreed, *but 54.8% disagreed,* with the statement, "if the prosecution goes to the trouble of bringing

Finally, petitioner did not prove that the views held by adults aged eighteen to twenty-nine could not be represented by other members of the community. Thus, petitioner failed to establish that young adults aged eighteen to twenty-nine constituted a cognizable group, and the district court properly rejected his claim.

## II.

■ Petitioner's second claim is that the prosecutor violated petitioner's rights under the equal protection clause of the fourteenth amendment by intentionally and systematically using peremptory challenges to exclude blacks from petit juries, including petitioner's. The standard controlling the resolution of this claim is that of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[13] Under *Swain,* a petitioner can establish a prima facie equal protection violation if he proves that

> the prosecutor ..., in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of [blacks] who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no [blacks] ever serve on petit juries.

*Id.* at 223, 85 S.Ct. at 837. We have held that *Swain* does not require a petitioner to prove that a prosecutor used his peremptory challenges to exclude blacks from petit juries "one hundred percent of the time." *United States v. Pearson,* 448 F.2d 1207, 1217 (5th Cir.1971).[14] Nevertheless, we have also recognized that a petitioner rais-

ing a *Swain* claim "bears a heavy burden when he seeks to show systematic discrimination of constitutionally significant proportions." *United States v. Brooks,* 670 F.2d 148, 151 (11th Cir.) (quoting *Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir.1980)), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339 (1982).

■ In the present case, petitioner submitted evidence to the district court showing that the prosecutor used all ten of his peremptory challenges to strike blacks from the jury, leaving an all-white petit jury. With respect to the alternate jurors, the prosecutor used his one peremptory challenge to strike the sole black presented for consideration, leaving two white alternate jurors. Furthermore, petitioner placed into evidence a stipulation outlining the prosecutor's use of peremptory challenges for the seventeen years preceding petitioner's trial. The stipulation disclosed that in the one hundred eighty cases prosecuted by the prosecutor, he had used peremptory challenges to strike seventy of the one hundred eighty-seven blacks presented as potential jurors.

The district court held that petitioner failed to establish a prima facie equal protection violation under *Swain* and denied relief on this claim. We agree with the district court's conclusion.

The prosecutor's striking of all black jurors and alternates in petitioner's trial, creating an all-white petit jury, does not, by itself, establish a *Swain* violation. *See Brooks,* 670 F.2d at 151; *United States v. Jones,* 663 F.2d 567, 572 (5th Cir. Unit B Dec. 1981).[15] Petitioner must also show a *systematic* or *historical* use of the peremp-

someone to trial, they're probably guilty." *See supra* note 5. Thus, petitioner's evidence did not prove that there was a common thread among young adults aged 18 to 29; it simply showed that their mix of attitudes on certain issues differed from the mix of attitudes of older adults.

**13.** We note that *Swain* has been overruled by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Supreme Court subsequently declared, however, that *"Batson* should not be applied retroactively on collateral review of convictions that became final before our opinion [in *Batson* ] was announced." *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 2880, 92

L.Ed.2d 199 (1986). Because petitioner's conviction became final within the meaning of *Allen, see id.* at 1856 n. 1, 106 S.Ct. at 2880 n. 1, seven years before *Batson* was decided, *Batson* is not applicable to this case and the *Swain* analysis applies.

**14.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**15.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former

tory challenge to exclude blacks from petit juries. Although petitioner has shown that, in the past, the prosecutor struck a higher proportion of black jurors than white jurors, we do not believe that the prosecutor's conduct rose to the level of a *Swain* violation. The stipulation indicates that although that the prosecutor had used peremptory challenges to strike seventy black jurors, he had allowed seventy-two blacks to sit as jurors, even though sixty-five could have been excluded through the use of peremptory challenges.[16] On the basis of this evidence, we cannot conclude that "the prosecutor was bent on striking [blacks] regardless of trial-related considerations." *Swain*, 380 U.S. at 226, 85 S.Ct. at 839. Accordingly, we hold that the district court's resolution of petitioner's *Swain* claim was correct.

### III.

Petitioner's third claim is that the conduct of the two prosecutors during the guilt and sentencing phases of trial rendered his sentencing proceeding fundamentally unfair.[17] Petitioner cites fourteen instances of supposed prosecutorial misconduct. The district court concluded that the prosecutors' alleged misconduct did not deny petitioner a fair sentencing proceeding, and rejected his claim. We affirm.

### A.

■ When a habeas petitioner contends that a state prosecutor's misconduct before

the jury rendered his trial fundamentally unfair, he means that one of three scenarios took place.[18] In the first scenario, petitioner's attorney afforded the petitioner effective assistance of counsel, as required by the sixth and fourteenth amendments to the Constitution. When the prejudicial misconduct occurred, the attorney made a timely objection, asked the court for relief —either a curative instruction or a mistrial—and the court denied his request. In this scenario, the trial court, rather than the prosecutor, caused the unfair trial, although the prejudice would not have occurred but for the prosecutor's misconduct. The petitioner's claim is, then, that the court denied him due process of law in violation of the fourteenth amendment.

■ In the second scenario, petitioner's attorney provided effective assistance of counsel, but did not object to the prosecutor's misconduct, reasonably concluding that he could eliminate the prejudice as the trial progressed and that it was to his client's advantage not to object. Defense counsel's strategy failed, however, and the prejudice remained. In this scenario, the petitioner's attorney, rather than the prosecutor or the court, caused the unfair trial. The petitioner has no constitutional claim in this situation: he received effective assistance of counsel and the court did not deny him a fair trial.[19]

■ In the third scenario, the petitioner's attorney provided ineffective assist-

---

Fifth Circuit handed down after September 30, 1981.

**16.** Of the 187 black potential jurors, the prosecutor struck 70 and defense counsel struck 45, leaving 72 blacks to sit as petit jurors. Of these 72 blacks allowed to sit, all but 7 could have been struck by the prosecutor had he used all of his peremptory challenges to exclude blacks whenever possible.

**17.** In *Willis I*, we held that the prosecutors' conduct during the guilt phase of petitioner's trial did not render that proceeding fundamentally unfair. *Willis I*, 720 F.2d at 1215. We expressly reserved the question now before us, to wit: whether the prosecutors' conduct during the guilt and sentencing phases of the trial combined to render petitioner's *sentencing proceeding* fundamentally unfair. *Id.*

**18.** A petitioner could contend that more than one scenario took place. For example, he could allege that his fundamentally unfair trial was the product of both trial court error and ineffective assistance of counsel.

**19.** It might be argued that in this scenario, the trial court denied the petitioner a fair trial by not declaring a mistrial or delivering a curative instruction to the jury on its own initiative. This argument is flawed, however. In the absence of a defense motion for mistrial, a court is not likely to declare a mistrial because this may operate to acquit the defendant. *See United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). A defendant is constitutionally entitled to proceed to verdict once jeopardy has attached. The sua sponte declaration of a mistrial, without the defendant's consent, would deny him that right and he could contend, prior to retrial, that retrial would consti-

ance of counsel and took no steps to eliminate the prejudice caused by the prosecutor's misconduct. In this scenario, petitioner's counsel, through his incompetence, caused the unfairness. The petitioner's claim is not that he was denied due process, but that he was denied effective assistance of counsel in violation of the sixth and fourteenth amendments.

In the present case, petitioner does not contend that his lawyer was ineffective. Thus, his claim must be that the court denied him due process of law when it denied his lawyer's requests for relief from the unfair prejudice the prosecutors injected into the sentencing proceeding.

With this in mind, we examine petitioner's claim. We begin by presenting the theory of the State's case against petitioner, and the theory of his defense. We then discuss the prosecutors' alleged misconduct before the jury and the court's treatment of petitioner's requests for relief.

### B.

The State accused petitioner of the murder of James Edward Giddens, the Chief of Police of Ray City, Georgia. The murder took place on February 11, 1976 between 10:30 and 11:00 p.m., near Lakeland, Lanier County, Georgia. It was the last of a series of crimes committed that night in south central Georgia by petitioner and his accomplices, Son Fleming and Larry Fleming. Early in the evening, the three men robbed a convenience store in Adel, Georgia, in adjoining Cook County. Petitioner and Larry Fleming, one of them armed with petitioner's .22 caliber revolver, went into the store while Son Fleming remained in their car, a red and white Ford. They accosted the manager, rifled the cash register, and fled with a brown paper bag of money and a carton of Kool cigarettes.

Chief Giddens was in his police car approximately fourteen miles east of Adel when he received a police broadcast about the robbery, describing a Ford automobile seen leaving the store. Shortly thereafter, the Ford passed by, and Chief Giddens pursued the car to investigate. Moments later, he radioed the police dispatcher that he was stopping the car and gave a definitive description of it, including the license number. Once the car had been stopped, Son Fleming, the driver, got out to speak with Chief Giddens. He, petitioner, and Larry Fleming then jumped Chief Giddens and struggled for his service revolver. They subdued Chief Giddens, placed him in the Ford, and drove the car over some isolated country roads to a swampy area.

During the trip, Chief Giddens begged them to spare his life, telling them that he would not report the incident, that he had a wife and three small children, and that he was scheduled to retire from the police force the next day. Son Fleming stopped the Ford near a swamp and everyone got out. Chief Giddens ran into the swamp, and Son Fleming shot at him with Giddens' service revolver. One of the bullets went through his body, crippling him. As Chief Giddens struggled to escape, petitioner and Larry Fleming, armed with petitioner's .22 revolver, hunted him down, and petitioner shot him five times in the face at close range.

Twenty minutes after Chief Giddens radioed the dispatcher that he was stopping a red and white Ford, a friend found his abandoned patrol car and used its radio to report that Chief Giddens was missing. At 12:30 a.m. the following morning, two

---

tute double jeopardy. *See id.* at 609, 96 S.Ct. at 1080 ("The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of [prejudicial prosecutorial] error."). Accordingly, in the second scenario, it would be difficult for a petitioner to argue successfully that the trial judge denied him due process by failing to declare a mistrial on his own initiative.

The sua sponte delivery of a curative instruction is not something that habeas courts require, in retrospect, every time a prosecutor has engaged in overreaching conduct. To be sure, there are occasions when a trial judge, without a request from counsel, interrupts the proceedings to deliver a cautionary instruction to eliminate undue prejudice. It does not follow, however, that the failure of the court to interrupt the proceeding to give a cautionary instruction amounts to constitutional error. Often, the delivery of a cautionary instruction would defeat defense strategy; accordingly, defense counsel frequently do not request such an instruction.

Brooks County deputy sheriffs stopped the Ford near Barney, Georgia. The Ford appeared to have two occupants: Son Fleming, behind the steering wheel, and petitioner, in the right front seat. The deputies drew their weapons and ordered the two men to get out of the car. Son Fleming and petitioner complied and were placed under arrest. One of the deputies then approached the Ford and discovered Larry Fleming hiding by the front seat, under the dashboard. The deputy also discovered Chief Giddens' revolver, petitioner's .22 caliber revolver containing two rounds of ratshot and seven empty cartridges, and the money and carton of Kool cigarettes taken in the robbery.

The next day, the police found Chief Giddens' bullet-riddled body face down in the swamp, about one hundred feet from the highway. An autopsy revealed that he had been shot several times in the face with ratshot and .22 caliber bullets at a range of less than fifteen inches. Chief Giddens' death occurred when one of the .22 bullets entered his brain.

Petitioner's defense, according to his attorney's opening statement to the jury at the beginning of the trial, was that Chief Giddens had already died when petitioner shot him in the face with his .22 caliber revolver, the death having been caused by a fragment from a .38 caliber bullet fired by Son Fleming. His alternative defense was that if petitioner shot Chief Giddens to death, he did so only because Son Fleming coerced him.

### C.

The first two instances of alleged prosecutorial misconduct took place during the pretrial phase of petitioner's prosecution and could have had no affect on the jury. Accordingly, they are immaterial.

■ The third instance of alleged misconduct occurred during the prosecutor's opening statement at the beginning of the guilt phase of the trial, when he stated that the evidence would show that before petitioner shot Chief Giddens, the Chief pleaded for his life. After the prosecutor concluded his opening statement, defense counsel moved for a mistrial on the ground that the prosecutor had no foundation for the remark. The court denied the motion.

■ The making of the remark did not constitute prosecutorial misconduct. Although the prosecutor did not subsequently establish that Chief Giddens pleaded for his life, the prosecutor apparently had a basis for believing that such plea had been made,[20] and he questioned petitioner about the plea on cross-examination during the guilt phase of the trial.

The fourth instance of alleged misconduct came as the prosecutor was establishing petitioner's guilt. The prosecutor called Chief Giddens' widow to the stand to establish that Chief Giddens was the victim and to identify his bloodstained shirt, which contained the bullet hole purportedly caused by Son Fleming's shot. Midway through her testimony, the widow became too emotional to continue. The trial judge excused the jury and directed that the witness be removed from the courtroom; she did not return to testify. Following her removal, defense counsel objected to the prosecutor's use of the witness and moved for a mistrial. Counsel conceded that her testimony was relevant, but argued that instead of using such a sympathetic witness who was likely to collapse on the witness stand, the State should have used other witnesses who were readily available. The court denied the motion for mistrial.

Although the widow's emotional breakdown undoubtedly had some impact on the jury, we cannot fault the prosecutor. The identity of the victim was an essential element of the State's case, and, as the trial court noted, the defense had not conceded that element by stipulation. Only after the widow had been removed from the courtroom and the court had denied petitioner's motion for mistrial did his attorney concede the issue. As for the shirt, the prosecutor had to establish that the shirt was Chief Giddens' before introducing it into evi-

---

20. Son Fleming, following his arrest, gave a confession in which he stated that Chief Giddens had pleaded for his life. *See Fleming v. Kemp,* 748 F.2d 1435, 1437 (11th Cir.1984).

dence. Petitioner could have conceded the admissibility of the shirt, thus eliminating the need for the witness' testimony on the point, but he did not do so.[21]

■ The next instance of alleged misconduct arose when the prosecutor examined the mayor of Ray City. The prosecutor asked the mayor if he knew the ages of the victim's children. After the witness answered the question, defense counsel objected to the testimony as irrelevant, and the trial judge sustained the objection. Counsel did not, however, request a curative instruction or move for a mistrial. Petitioner now contends that this testimony rendered his sentencing proceeding fundamentally unfair.

In this instance, the trial court gave petitioner all the relief he requested. Arguably, the court could have taken it upon itself to instruct the jury to disregard the reference to the victim's children. We cannot say, however, that the court denied petitioner due process of law by not doing so.

■ The sixth instance of alleged misconduct arose while the prosecutor was examining Warren Tillman, the State's ballistics expert, during the guilt phase of trial. Tillman appeared unprepared to testify, and the prosecutor sought to explain his unpreparedness by asking "Were you called away from Forsyth, Georgia to come here?," to which Tillman answered, "yes." Defense counsel made no objection. In his habeas petition to the district court, however, petitioner alleged that the prosecutor's reference to Forsyth, Georgia somehow prejudiced the jury because at that time a highly publicized capital case involving a Bleckley County murder, which the jurors presumably knew about, was being tried in Forsyth. This claim of prosecutorial misconduct is patently frivolous and merits no further comment.

The seventh and eighth instances of alleged misconduct took place at the guilt phase of the trial, during the presentation of petitioner's defense. Petitioner had called Berrien County Sheriff Walter Gaskins and Georgia State Patrol Commander Stewart McGlaun to the stand in an effort to demonstrate that his confession, which the State had introduced during its case in chief, had been coerced. On direct examination, both had testified that, while in their custody, petitioner had given no indication of being a violent person, the inference being that he could not have committed the murder without having been forced to do so. On cross-examination, the prosecutor, in an effort to dispel this inference, asked each of them whether he had seen petitioner "on the butt end of this smoking .22." Defense counsel made no objection until he filed his federal habeas petition. This claim, like the preceding one, is patently frivolous.

The ninth and tenth instances of alleged prosecutorial misconduct occurred while the prosecutor was cross-examining petitioner during the guilt phase of the trial. The prosecutor asked petitioner whether the victim had pleaded for his life. There was no objection to the question, and petitioner answered it with a denial. Later, the prosecutor asked petitioner whether he had called the victim a "honkey." Petitioner answered the question, denying the statement. Defense counsel objected, demanding that the prosecutor reveal his basis for the question. The court overruled the objection, observing that petitioner had already denied making the statement and that an offer of proof would serve no purpose. Some time later, during a recess in the proceedings, defense counsel moved for a mistrial, and the court denied the motion.

■ The prosecutor's question whether the victim had pleaded for his life was not improper because, as we have noted, he had a basis for asking the question. With respect to the question whether petitioner had called the victim a "honkey," the record does not disclose whether the prosecutor had reason to believe that the incident had occurred. Even if no reason for

---

**21.** We also note that the prosecutor's use of the widow as a material witness may have benefited petitioner. Because the trial judge invoked the sequestration rule, excluding the witnesses from the courtroom while the trial was in progress, the widow was barred from the courtroom.

the question existed, thus making it inappropriate, we do not believe that it deprived petitioner of a fair sentencing proceeding. We cannot say that the trial judge should have anticipated that this single question, posed during the guilt phase of petitioner's trial, created a reasonable probability that petitioner's sentencing proceeding would be fundamentally unfair, and accordingly should have granted a mistrial.

■■■ The eleventh instance of alleged misconduct came during the sentencing phase of petitioner's trial. While cross-examining Dr. Fay Goldberg, a psychiatrist who had testified on direct examination that petitioner was capable of rehabilitation, the prosecutor asked her whether she had performed any tests on Chief Giddens and whether she knew how long he would be dead. Defense counsel did not object; the court, however, interrupted before Dr. Goldberg could answer and instructed her to disregard the prosecutor's inquiry. Petitioner now asserts that the prosecutor's inquiry denied him a fundamentally fair sentencing proceeding. Although the inquiry was ridiculous, we are convinced that the trial judge's intervention eliminated any prejudice that may have been created.

The twelfth instance of alleged prosecutorial misconduct actually involved the trial judge, not the prosecutor, and took place during a recess, as the parties were preparing to address the jury at the close of the sentencing phase of the trial. The victim's young son had been present in the courtroom throughout the day, dressed in a copy of a Ray City police uniform. Defense counsel asked the court to order the child removed from the courtroom. The court denied his request, noting that the trial was open to the public, including the victim's children, that the children had been present throughout the guilt and sentencing phases of the trial, and that they had behaved themselves properly. Defense counsel then moved for a mistrial, which the trial court denied.

■■■ We see no error, much less a constitutional deprivation, in the trial court's ruling. Petitioner cites no authority for the proposition that due process requires that in a capital sentencing proceeding, the defendant has a constitutional right to have removed from the courtroom spectators whose presence may remind the jury of the victim. A criminal proceeding is a public hearing; all citizens, including the victim's family, have a right to attend.

■■■ The thirteenth and fourteenth instances of alleged prosecutorial misconduct came as the prosecutor was addressing the jury at the close of the sentencing phase of petitioner's trial. First, the prosecutor commented that because the defendant's expert witnesses were, in effect, from "out of town," their testimony should be given little weight. Second, he asked the jury to consider the danger petitioner would pose if returned to society. This remark, according to petitioner, amounted to a reference to parole, in violation of Ga.Code Ann. § 27–2206 (1981) (recodified as amended at Ga.Code Ann. § 17–8–76 (1982)).[22] Defense counsel made no objection to either remark until he commenced these habeas proceedings in the district court. His objections, considered as due process claims, are frivolous.

In sum, petitioner's claim that prosecutorial misconduct in the guilt and sentencing phases of his trial combined to deny him a fair sentencing proceeding is without merit. Accordingly, the district court properly denied petitioner's request for a writ of habeas corpus on this claim.

22. Section 27–2206 provided:
No attorney at law in a criminal case shall argue to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury, because pardon, parole, or clemency of any nature may be granted by the Governor, State Board of Pardons and Paroles, or other proper authority vested with the right to grant clemency. If counsel for either side in a criminal case should so argue to the jury, opposing counsel shall have the right to immediately request the court to declare a mistrial; and in which case, it shall be mandatory upon the court to declare a mistrial; and upon failure so to do, same shall constitute reversible error.

## IV.

The judgment of the district court denying the petition for a writ of habeas corpus is therefore

AFFIRMED.