**Tommie J. SMITH, Petitioner–Appellant,**

v.

**Robert A. FARLEY, Superintendent, Indiana State Prison, Respondent–Appellee.**

No. 94–3818.

United States Court of Appeals, Seventh Circuit.

Argued May 24, 1995.

Decided July 5, 1995.

662

F. Thomas Schornhorst (argued), Indiana University School of Law, Bloomington, IN, Michael P. Rehak, South Bend, IN, for petitioner-appellant.

Arend J. Abel (argued), Office of Atty. Gen., Indianapolis, IN, for respondent-appellee.

Before POSNER, Chief Judge, and BAUER and FLAUM, Circuit Judges.

POSNER, Chief Judge.

Tommie Smith is under sentence of death in Indiana for murdering a police officer. The district court denied his petition for habeas corpus, and Smith appeals. Three years ago we affirmed the denial of habeas corpus to Smith's codefendant, Gregory Resnover, who has since been executed. *Resnover v. Pearson*, 965 F.2d 1453 (7th Cir. 1992). To the extent that Smith presents grounds for reversal that are identical to those we resolved against Resnover, we reject them on the authority of our previous decision, for nothing has happened in the interim to warrant a reexamination of any of our rulings. We confine discussion to issues not presented in that case.

Smith, Resnover, and Resnover's brother Earl were a band of robbers. Resnover (Gregory, unless otherwise indicated) and Smith were wanted by the police for two recent armed robberies. In one, another brother of Resnover had been killed, and in the other a Brinks guard had been killed. The investigation was led by detective sergeant Jack Ohrberg of the Indianapolis police. The band may have known that Ohrberg was after them, for after the killing Ohrberg's business card, with his wife's name and his home telephone scrawled on the back, were found on Earl Resnover's person.

With the police closing in, the band decided to fight it out. Equipping themselves with an arsenal that included two assault rifles (both AR–15's), they holed up in a house and barricaded the front door with furniture. Before dawn, on a December day in 1980, Ohrberg and four other police officers appeared at the house to serve warrants for the arrest of the members of the band. Ohrberg knocked on the front door, shouting "police." A neighbor heard a male voice inside the house shout, "It's the motherfuckin' police." Ohrberg forced the front door open with his shoulder, and as the door opened he was fired upon by Smith and Resnover from the front room of the house. He was hit, and collapsed on the porch. The other officers ducked for cover. Smith and Resnover fired at them. Smith went out on the porch and fired several times at Ohrberg's motionless body. He then went back inside and, seriously wounded himself, collapsed, unconscious. Resnover then surrendered. Earl Resnover had remained in a back room throughout the mêlée. Ohrberg had been shot three times, and was dead. One of the bullets came from the AR–15 that was found lying next to the unconscious Smith; the other two could not be identified.

It makes no difference to Smith's or Resnover's guilt of murder and conspiracy to murder which of them fired the bullet or bullets that actually killed Ohrberg. To be guilty of conspiracy to murder they had only

to agree to murder, and commit an overt act in furtherance of the conspiracy, Ind. Code § 35–41–5–2; *Sawyer v. State*, 583 N.E.2d 795, 798–99 (Ind.App.1991), while to be guilty of murder it was enough that they jointly engaged in conduct that was intended or highly likely to result in death and that death did result. *Harris v. State*, 617 N.E.2d 912, 915 (Ind.1993); *Murphy v. State*, 518 N.E.2d 1079, 1082 (Ind.1988); *Smith v. State*, 465 N.E.2d 1105, 1125 (Ind.1984) ("under these circumstances there need be no actual proof as to which of these participants actually caused the death of Sgt. Ohrberg"); *Smith v. State*, 516 N.E.2d 1055, 1062 (Ind.1987). Obviously it is not necessary to show that each participant fired the (or a) lethal shot, as that would make it impossible in most cases to convict more than one person of the same murder even if the murder was the result of a scheme in which more than one person participated, as it was here. And there is no constitutional bar to executing a participant who did not personally inflict the fatal wound. *Tison v. Arizona*, 481 U.S. 137, 157, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); *Resnover v. Pearson, supra*, 965 F.2d at 1464.

Smith and Resnover were tried together, in 1981, and the jury convicted both of them of murder and of conspiracy to murder. The jury reconvened the next day for the death-penalty hearing and recommended the death penalty for both defendants. Under Indiana law, the judge makes the final decision. Ind. Code § 35–50–2–9(e); *Roark v. State*, 644 N.E.2d 565, 571 (Ind.1994). She sentenced both defendants to death for murder and to fifty years in prison for conspiracy to murder. The Indiana Supreme Court affirmed Smith's convictions and sentences and, later, the denials of his petitions for state postconviction relief. *Smith v. State*, 465 N.E.2d 1105 (1984), 516 N.E.2d 1055 (1987), 613 N.E.2d 412 (Ind.1993).

■ We begin with the challenge to the conviction. Smith does not argue that the evidence that he committed murder was insufficient; the evidence was overwhelming. He complains about errors in the rulings at trial. Shortly after Resnover and Smith were arrested, Resnover told a newspaper reporter that he had "picked up a gun and fired some shots toward the front of the house" after Smith, already wounded, had said to him, "They're on the porch, get 'em off the porch." The reporter testified to this statement at trial. Smith claims that its admission without deletion of Smith's name violated the rule of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which forbids the admission of a codefendant's statement that inculpates the defendant. The claim fails because the statement did not inculpate Smith. His defense was not that he hadn't shot at the police. That would have been incredible. His defense was that he didn't know they were police. He thought that they were housebreakers, and he and Resnover were trying to defend themselves. Resnover's statement to the reporter was consistent with that defense.

■ Smith's principal challenge to his conviction is based on remarks by the prosecutor in closing argument. Two of the remarks had racial overtones. This is especially troubling because the defendants were black, while the victim of the murder, the judge, the prosecutor, and the entire jury were white. The prosecutor referred to a reluctant prosecution witness, a black woman, as "shucking and jiving" on the stand, by which he meant she was lying. And he referred to Smith's conduct during the mêlée as Smith's acting like "super-fly." There is no place in a criminal prosecution for gratuitous references to race, especially when a defendant's life hangs in the balance. Elementary concepts of equal protection and due process alike forbid a prosecutor to seek to procure a verdict on the basis of racial animosity. *United States v. Doe*, 903 F.2d 16, 24–25 (D.C.Cir.1990). But reversals on this ground are rare; *Doe* is the only reported appellate case in the last fifteen years.

■ Race occupies a special place in the modern law of constitutional criminal procedure; and whether rightly or wrongly is not for us to say. The normal rule of harmless error is relaxed in two areas—the use of peremptory challenges, and the composition of the grand jury—when the error involves racial prejudice. *Tyson v. Trigg*, 50 F.3d

436, 442 (7th Cir.1995), citing cases. This approach has not been generalized across the entire landscape of procedural errors involving racial prejudice, however, or extended to racial references more aptly described as insensitive than as bigoted. The cost in judicial and prosecutorial resources that would be consumed in retrials designed to vindicate an abstract principle rather than to prevent the conviction of a possibly innocent defendant has been thought too high. The cases hold that one or two isolated references to race or ethnicity, wholly unlikely to sway a jury, do not compel a new trial on federal constitutional grounds when the defendant's guilt is established by overwhelming evidence. *United States v. Hernandez,* 865 F.2d 925, 927–28 (7th Cir.1989); *Russell v. Collins,* 944 F.2d 202, 204 n. 1 (5th Cir.1991) (per curiam); *Willis v. Kemp,* 838 F.2d 1510, 1522–23 (11th Cir.1988).

■ It is not even certain, turning to the specifics of the present case, that the reference to the witness's "shucking and jiving" was racial in character. Cf. *United States v. Weiss,* 930 F.2d 185, 196 (2d Cir.1991); *United States v. Lively,* 817 F.Supp. 453, 463–64 (D.Del.), *aff'd without opinion,* 14 F.3d 50 (3d Cir.1993). The phrase is Negro dialect, *A New Dictionary of American Slang* 388 (Robert L. Chapman ed. 1986); Geneva Smitherman, *Black Talk: Words and Phrases From the Hood to the Amen Corner* 205 (1994), but numerous words and phrases of that dialect, just like Yiddishisms such as *schnorrer* and *chutzpah,* have become absorbed into standard English and are now applied to members of all racial and ethnic groups. Examples from Smitherman's book include "badmouth," "boss" (as an honorific), and "Saturday night special." But we do not know whether "shucking and jiving" is one of these "crossover" terms, and while it was his own witness that the prosecutor was disparaging (for having withdrawn a pretrial statement that had incriminated the defendants), she was a hostile witness and if the jury totally disbelieved her the prosecution would be harmed less than the defense.

The racial character of "super-fly" (more properly "Superfly") is unmistakable. The reference is to the eponymous hero of a 1972 movie (and its 1973 and 1990 sequels, but of course the last came too late to have possibly affected the jury), a black dealer in cocaine who seeks to neutralize the police by hiring the Mafia to kill the police commissioner's "faggot son and fat-legged daughter" should the need arise, and who succeeds in getting away with his crimes. There is no doubt that the prosecutor was referring to this "Superfly," but through all the long years of Smith's postconviction proceedings his lawyers have made no effort to establish the likely meaning of the term to the members of the jury or to persons demographically similar to them. The movie was intended for and marketed to black audiences. No doubt some white people in Indianapolis saw it, and more heard about it. But no effort has been made to establish what the term "Superfly" is likely to have meant to these people. (The dictionaries define it positively: "superior; wonderful," *A New Dictionary of American Slang, supra,* at 423; "exceptionally upscale; ultra exciting and with-it," Smitherman, *supra,* at 218.) The race of the defendant was not a secret. It is merely conjecture that the use of the term "super-fly" had any impact on the jury's consideration of the case.

We pass over the comments of the prosecutor that we discussed in our opinion in Resnover's case and arrive at his statement that "another section of our people who are our policemen are watching you." Smith takes this to be an intimidating reference to the fact that the audience section of the courtroom was packed with policemen. The text itself is ambiguous, for it follows by a few sentences the remark, "The community watches," which is probably not a reference to the audience in the courtroom. But Smith's lawyer, during his closing argument, remarked without objection that "we've had a packed courtroom full of police officers." So "our policemen are watching you" could indeed refer to the police in the audience.

■ Of course if you kill a policemen and are put on trial for the crime, you must expect the courtroom audience to include policemen; and Smith does not argue that they should have been excluded. Cf. *Willis v. Kemp, supra,* 838 F.2d at 1523. But he is right to be concerned if the prosecutor refers

to the presence of the police in the audience in a way that makes the jurors uneasy about the consequences of their voting to acquit the defendant. Efforts by spectators at a trial to intimidate judge, jury, or witnesses violate the most elementary principles of a fair trial. *Moore v. Dempsey,* 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (Holmes, J.); *Woods v. Dugger,* 923 F.2d 1454, 1456–60 (11th Cir. 1991); *Norris v. Risley,* 918 F.2d 828, 832–33 (9th Cir.1990). But we cannot say that this single, ambiguous sentence in a long closing argument created an atmosphere of intimidation merely because of the presence of some policemen in the courtroom as spectators. No effort has been made to show how many there were, or even whether they were in uniform (remember that Ohrberg was a detective, not a uniformed policeman); and there is no suggestion of intimidating circumstances other than the presence of this unknown number of policemen in the courtroom and the single sentence that we quoted. These are not enough to warrant a conclusion that Smith was denied a fair trial. Cf. *Holbrook v. Flynn,* 475 U.S. 560, 570–71, 106 S.Ct. 1340, 1346–47, 89 L.Ed.2d 525 (1986).

■ Smith challenges the quality of his representation at trial and on direct appeal. A full evidentiary hearing on the issue was conducted in a state postconviction proceeding. There Smith's trial lawyer testified at length about the reasons for the tactics he had employed at the trial. The judge found his testimony more credible than that of Smith, who accused the lawyer of having failed to communicate with him or pursue promising lines of defense, such as that the arsenal found by the police was intended for hunting and the bullet-proof vest to protect a child from being shot accidentally on the hunting expedition. We have no basis for disturbing the finding concerning which of the two, the lawyer or Smith, was telling the truth.

■ What is also true however is that the lawyer—a different lawyer—who handled Smith's direct appeal to the Indiana Supreme Court did an atrocious job. He filed a brief that was 796 pages long, most of them taken up by discussion of waived, hopeless, or irrelevant grounds of appeal. Yet the only colorable ground waived by the brief was ineffective assistance of counsel in the trial court, and despite the waiver that ground was, as we have seen, explored at length and rejected on the merits in the state postconviction proceedings. With a few exceptions, every other colorable ground was fully ventilated by competent counsel in subsequent proceedings, and the Indiana Supreme Court issued two subsequent opinions. The remedy for ineffective assistance of counsel is a fresh appeal with competent counsel. Smith got that appeal—twice. The few issues that the Indiana Supreme Court refused to consider on the ground that they had been raised and decided in Smith's direct appeal are ones that the court determined had been adequately presented there despite the verbosity of the brief. *Smith v. State, supra,* 516 N.E.2d at 1060, 1062; see also *id.* at 1066. No doubt the issues would have been more perspicuous if not smothered in lard; but provided that the court considers fully the grounds that are raised, the fact that appellate counsel may not have presented them in a competent manner will usually not be prejudicial. It was not prejudicial here, just as it was not prejudicial in *Heath v. Jones,* 941 F.2d 1126, 1131–32 (11th Cir.1991), where the lawyer committed the opposite error of filing briefs that were too short (the argument sections of his two briefs were only one and six pages in length, respectively).

■ Judges are not umpires, calling balls and strikes; or judges of a moot court, awarding victory to the side that argues better; least of all is that their disposition in a death case. Appellate courts do rely on counsel to present the grounds for reversal, but in this country, unlike the practice in England, where the judges have no law clerks, they do not depend on counsel to find all the cases and all the reasons in support of the appeal. *In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1299 (7th Cir.1995). The better lawyers resent this, feeling that it is "unfair" for judges to do the work of the weaker lawyers. But that is the way it is, and consequently, except in highly unusual cases that we cannot at present envision, it is only when counsel fails to perfect his client's appeal or waives potentially meritorious

grounds for reversal that his substandard performance will be deemed sufficiently prejudicial to warrant giving his client a new appeal. See, e.g., *Claudio v. Scully,* 982 F.2d 798, 801, 803–05 (2d Cir.1992); *Lofton v. Whitley,* 905 F.2d 885 (5th Cir.1990). We add that the issues that the Indiana Supreme Court did not allow to be rebriefed, as it were, have no apparent merit.

■ We turn to whether error of constitutional dimensions was committed in the hearing on the death penalty. For purposes of evaluating this question we agree with Smith that the closing argument of the prosecutor at the trial of the issue of guilt can be considered along with the closing argument of the prosecutor at the penalty hearing, even though they were different prosecutors; for the penalty hearing followed immediately upon the completion of the trial. This potential carryover effect has been assumed in previous cases, *Darden v. Wainwright,* 477 U.S. 168, 183 n. 15, 106 S.Ct. 2464, 2472 n. 15, 91 L.Ed.2d 144 (1986); *Willis v. Kemp, supra,* 838 F.2d at 1519 n. 17, but we think it important to emphasize the point, as it would be entirely unrealistic to suppose that the same jury that had decided guilt would approach the sentencing phase with a *tabula rasa.* But as there was no reference to race in the sentencing hearing, or to the police watching, the force of these questionable comments at the trial on guilt was, at least, diluted.

■ Smith argues that the jury was misinstructed at the penalty hearing. To bring back a recommendation of capital punishment the jury had to find at least one aggravating circumstance of the murder, and the only one suggested was that Smith had murdered a policeman in the line of duty knowing his victim to be a policeman. Ind. Code § 35–50–2–9(b)(6); *Castor v. State,* 587 N.E.2d 1281, 1290 (Ind.1992). (The requirement of knowledge is not explicit in the statute, but is assumed in the cases.) Ordinarily, of course, an error in instructions on a matter of state law does not raise a constitutional issue, *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Eaglin v. Welborn,* 57 F.3d 496, 501 (7th Cir. 1995) (en banc), but it can when the effect is

to withdraw from the jury an issue on which the Constitution requires proof, such as guilt—or in a death case whether there is at least one aggravating circumstance, for without it a death sentence is unconstitutional. *Tuilaepa v. California,* —— U.S. ——, —— – ——, 114 S.Ct. 2630, 2634–35, 129 L.Ed.2d 750 (1994).

■ But the jury *was* instructed that it had to find that Smith knew his victim was a policeman. So the instruction was adequate; and in any event an error in the instruction could not have mattered. The jury—the same jury—had just found Smith guilty beyond a reasonable doubt of conspiracy to murder a policeman because the police were getting too hot on the trail of the gang. Implicit in that finding was the further finding that the defendants knew that the man who knocked and cried "police" and shoved his way through the barricaded doorway was indeed a policeman. The sentencing hearing is not an occasion for reexamining the issue of the defendant's guilt. *Franklin v. Lynaugh,* 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988) (plurality opinion); *id.* at 187–88, 108 S.Ct. at 2334–35 (concurring opinion); *Smith v. Black,* 904 F.2d 950, 968–69 (5th Cir.1990); *Allen v. State,* 406 N.E.2d 976, 981 (Ind.App.1980).

■ Smith argues that by misleading paraphrase of the Supreme Court's opinion in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the prosecutor made the jury think that the Supreme Court *wanted* the jury to recommend capital punishment for Smith—which might indeed be misconduct on the prosecutor's part sufficiently serious to warrant a new hearing, as it might make the jury feel that it had no real discretion to recommend lenity. *Wilson v. Kemp, supra,* 777 F.2d at 627. The prosecutor told the jury that the Court had said in *Gregg* that "the reason for the death penalty is retribution" and that "when a people begin to believe an organized society is unable or unwilling to impose on the criminal offenders the punishment they deserve, then are sown the seeds of anarchy, of self-help, vigilante justice and lynch law." And on in that vein. But as it happens the prosecutor was para-

phrasing the plurality opinion of Justice Stewart in the *Gregg* case accurately. See 428 U.S. at 183–84, 96 S.Ct. at 2930. The opinion had said that if society does not visit upon criminal offenders the punishment they deserve, the citizenry will take the law into their own hands. The opinion did not say, and the prosecutor did not say, that therefore murderers should be executed. All that either the opinion or the prosecutor said or implied was that the punishment should fit the crime and that if the crime is heinous enough capital punishment is appropriate, not that it is mandatory. That is the basis upon which Justice Stewart thought capital punishment constitutional. And he was a moderate on the question of the constitutionality of capital punishment, having voted a few years earlier to strike down all existing capital-punishment laws. *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (concurring opinion). The "average" opinion of the Justices who voted for capital punishment in *Gregg* would have been more emphatic about the social benefits of the practice.

■ Smith's principal ground for asking for a new penalty hearing is that his counsel at that hearing was incompetent. This tactic is utterly unavailing because it is plain that counsel could have done nothing for him. The first reason is that Smith boycotted the penalty hearing. The second is that to this day he has not suggested that there were any mitigating factors that his counsel might have brought out in his absence and that might have swayed the jury. We are not surprised, given the statement that he made to the judge before the judge imposed sentence. (Smith boycotted only the jury phase of the sentencing hearing.) He said that he would do what he did over again, because he had thought Ohrberg was an intruder, not a policeman. That was his defense at trial. The jury did not believe it. It would not have believed it had his lawyer presented affidavits of good character from Smith's mother and other relatives, as his present counsel urges should have been done though without particulars as to what the affidavits would have said.

■ Smith also complains that his lawyer at the sentencing hearing failed to present evidence that Smith could not have shot Ohrberg when he went out on the porch, because of the path of the bullets in Ohrberg's body in relation to the posture in which the body was found. The evidence was contestable and peripheral. There was little doubt, given the testimony of the police and Smith's own admission, that Smith had gone out on the porch during the shoot-out; that he hadn't been motivated by innocent curiosity; that he had been shot after Ohrberg was down (for a bullet from Smith's gun was found in Ohrberg's body and Smith was wounded when a bullet fired by the police shattered his gun); that he was trying to kill policemen; and that Ohrberg, lying on the porch, was nearest to hand. The fact that Smith may have missed when firing at Ohrberg at point-blank range is not the miracle that Smith's counsel depicts it as, for it was still dark and Smith was being shot at and was no doubt in a state of some agitation.

■ Smith also faults his counsel at the penalty hearing for having failed to bring out the fact that Ohrberg had violated Indiana law by failing to announce his business when he knocked and the further fact that the search of the house that followed the shoot-out was made without a warrant and was, Smith contends, unlawful. We doubt that it was an unlawful search, since it was a protective sweep following an arrest pursuant to a valid warrant for Smith's arrest. *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); cf. *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980); *United States v. Pallais*, 921 F.2d 684 (7th Cir.1990). And we doubt that in the circumstances Ohrberg was required, either by Indiana law or by the U.S. Supreme Court's recent decision constitutionalizing the duty of the police to announce their business before forcibly entering a house, *Wilson v. Arkansas*, —— U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), which has a broad exception for exigent circumstances, *id.* at —— ——, 115 S.Ct. at 1918-19, to delay his entry into a den of armed robbers while he explained patiently what he was there for—which they knew. But these are details. These alleged violations of state

or federal law had nothing to do with the appropriateness of condemning Smith to death. No doubt if Ohrberg had paused to state his business this would have weakened still further Smith's defense of self-defense. But the fact, if it is a fact, which probably it is not, that Ohrberg may have been required by law to state his business has no bearing on the question of self-defense, which was fully ventilated in the trial on guilt.

The whole is sometimes greater than the sum of the parts, but having considered all the alleged errors at the penalty hearing, including those discussed previously in our opinion in Resnover's case, those that may have been committed during the guilt phase of the criminal proceeding and carried over to the jury's consideration of the sentence, and a few trivial ones that we have not bothered to discuss at all, we are unpersuaded that Smith was deprived of any of his rights under the U.S. Constitution. The judgment for the respondent is therefore

AFFIRMED.