224 N.J. Super. 208 (1987)
539 A.2d 1284
STATE OF NEW JERSEY, PLAINTIFF,
v.
FRANK A. FLOWER, DEFENDANT.
Superior Court of New Jersey, Law Division Somerset County.
Decided April 30, 1987.
*210 Timothy Van Hise, for plaintiff (Nicholas L. Bissell, Jr., Prosecutor of Somerset County, attorney).
Anthony J. Mignella, for defendant (William J. Bizub, Deputy Public Defender of Somerset County, attorney).
IMBRIANI, J.S.C.
This case involves a pretrial motion to determine the admissibility of two oral confessions. The first confession was obtained by an investigator at the prosecutor's office on the date *211 defendant was arrested and the second confession was obtained by an investigator from the Division of Youth and Family Services (hereinafter DYFS) at the county jail two days later.
Defendant (26-years old) was charged with first degree aggravated sexual assault upon a 3 1/2-year-old child in violation of N.J.S.A. 2C:14-2a. He does not deny receiving Miranda warnings from the prosecutor's investigator or giving the two confessions; nor does he claim that either confession was the product of physical or mental force or coercion exerted by the police or anyone else. Rather, he asserts that he is a mentally retarded person with the limited intelligence of a six- or seven-year-old child who cannot understand, much less "knowingly and intelligently" waive his Miranda rights and therefore, any "waiver" on his part was meaningless and should not be given any efficacy.
Defendant offered the testimony of three of his high school teachers who taught him in a special class about seven years ago. All described defendant as being polite, but having an IQ of less than 70 and a person who spoke "very slowly," sometimes with "slurred" speech. He had to be spoken to in very basic terms and any instructions given to him had to be repeated time and again and also repeated by him before one could be certain that he understood. His limited vocabulary was of a second- or third-grade level and he was described as not having the ability to grasp and understand concepts or abstractions. All three teachers spoke with defendant recently and testified that his mental ability remains the same today as it was seven years ago. For these reasons, each teacher opined that even if Miranda rights were explained to him, he would not be able to understand what they were and knowingly and intelligently waive them.
Defendant testified that he was "afraid of going to jail" so he answered every question, "yes." While he was on the witness stand it was readily and quickly apparent to the court that he did not know his right hand from his left, could not see from his *212 right eye, and could neither read nor write. A foster guardian with whom defendant resided for the past seven years testified that defendant would "say yes to anything."
The State offered the testimony of its investigator, who spoke briefly with defendant at a store where he worked part time, and then took him to the prosecutor's office for questioning. When informed of his Miranda rights defendant stated that he understood each and every one of the five rights contained therein. No force, duress or coercion of any nature was ever exerted upon defendant. Defendant was then orally questioned alone for about 30-45 minutes and immediately thereafter he gave a formal cassette-taped oral confession.
Two expert witnesses testified. A clinical psychologist for defendant examined him an average of about 45 minutes on each of six interviews. He stated that defendant is retarded and does not have the mental capacity to understand an abstract right as is contained in the Miranda warnings. He said that you cannot rely on a simple "yes or no" answer from defendant, who has the age equivalent of a child 7- to 12-years old and is in the lower 2% of the population in intelligence. Therefore, he opined that any waiver from defendant would be meaningless.
The State offered a psychiatrist who testified that defendant has the mentality of a six- or seven-year-old but that such a child, including this defendant, can understand the significance of his Miranda rights. He saw defendant only once for part of one hour because at the time he had another client in his office, but in a different room.
Also testifying were Ruth Barr, 22-year-old mother of the child, and Harold Flower, brother of defendant and live-in boyfriend of Ruth Barr. Both testified that they would on occasion leave the child with defendant for three or four hours on Saturday evenings. At some point the child complained of problems in her vaginal area and when taken to a doctor for an *213 examination, he referred the case to the police and this investigation followed.
Whenever the State bears the burden of proof in a motion to suppress a statement allegedly obtained in violation of the Miranda doctrine, the United States Constitution requires that the State need prove waiver by defendant of such rights only by a preponderance of the evidence, Colorado v. Connelly, 479 U.S. 157, ___, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986), but New Jersey requires the higher standard of beyond a reasonable doubt. State v. Yough, 49 N.J. 587, 600-601 (1967); State v. Whittington, 142 N.J. Super. 45, 49-50 (App.Div. 1976). It is "an established principle of our federalist system" that states may afford "individual liberties more expansive than those afforded by the federal constitution." State v. Novembrino, 105 N.J. 95, 144-145 (1987).
Generally, a statement given by a defendant is not admissible in a criminal case unless the court is satisfied beyond a reasonable doubt that the defendant was informed of his Miranda rights before giving the statement and "in light of all the circumstances attending the confession it was given voluntarily." State v. Hampton, 61 N.J. 250, 272 (1972). What is at stake is ensuring the use of effective procedural safeguards to secure the right of the Fifth Amendment to the United States Constitution that "no person shall be ... compelled in any criminal case to be a witness against himself," which is now made applicable to state action by the Due Process Clause of the Fourteenth Amendment. However, once informed of his rights "a defendant may waive effectuation of these rights provided the waiver is made voluntarily, knowingly and intelligently." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); emphasis supplied.

CONFESSION GIVEN TO PROSECUTOR'S INVESTIGATOR.
Clearly this defendant was informed by the prosecutor's investigator of his Miranda rights, was not subjected to any *214 physical or mental coercion, and did "waive" his constitutional rights and give an oral confession. The issue is whether the waiver, although admittedly given voluntarily in the sense that it was not the product of force or duress, was, in addition, given "knowingly and intelligently." Defendant asserts he did not possess the mental capacity necessary to knowingly and intelligently waive such an abstract right; on the other hand, the State argues that it is not proper to search into the state of mind of a defendant and a court may only inquire whether physical or mental coercion was exerted by the police to obtain the confession, relying on Colorado v. Connelly, supra, which held that a:
defendant's mental condition, by itself and apart from its relation of official coercion [107 S.Ct. at 520] [will not result in the suppression of a confession because] coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. [107 S.Ct. at 522]
But the State misconceives the issue before this court. Defendant does not dispute that he "voluntarily" waived his Miranda rights in the sense that no one forced or coerced him to do so. What he asserts is that he did not do so "knowingly and intelligently" and that an examination of this issue does require an inquiry into the state of mind of a defendant.
New Jersey does treat an accused with diminished mental capacity (whether because of age or a mental defect) differently than it does adults who are presumed to be responsible. The former hold a protected status in our society. Therefore, when ascertaining whether a person with diminished mental capacity acted knowingly and intelligently the court must satisfy itself that the administering of constitutional rights was more than a mere perfunctory procedure.
This case is not unlike State in the Interest of S.H., 61 N.J. 108 (1972) which held that:
recitation of the Miranda warnings to a boy of 10 even when they are explained is undoubtedly meaningless. Such a boy lacks the capability to fully understand the meaning of his rights. Thus, he cannot make a knowing and intelligent waiver of something he cannot understand. [at 115]
*215 The Supreme Court did not prohibit the questioning of such a person but directed that questioning may go forward only if it "convincingly" appears that the "questioning is conducted with the utmost fairness and in accordance with the highest standards of due process and fundamental fairness". Ibid. Since the ten-year-old boy was questioned at police headquarters in the absence of his parents, guardian or a friend to independently counsel him, his confession was suppressed. It is interesting to note that one sister state has held, when dealing with a juvenile, a valid waiver requires at a minimum a showing of prior consultation by the juvenile with an independent, impartial, responsible and interested adult. In re E.T.C., 141 Vt. 375, 449 A.2d 937 (Sup.Ct. 1982).
This philosophy was earlier espoused in Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) which invalidated a confession given by a 15-year-old. While Haley is not on all fours with this case because it involved a juvenile and persistent questioning over a period of three days, it does contain much language that is equally applicable here.
[w]hen, as here, a mere child  an easy victim of the law  is before us, special care in scrutinizing the record must be used.... we cannot believe that a lad of tender years is a match for the police ... He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at [his] side ... No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning. [332 U.S. at 599-600, 68 S.Ct. at 303-304]
The fact that S.H. and Haley were juveniles and not adults of diminished mental capacity does not militate against their applicability to this case. This defendant was questioned alone at the prosecutor's office after being removed from his place of employment. Like Haley he needed "counsel and support" but he was compelled to rely on himself, and like Haley he was "no match for the police" when asked to waive his Miranda rights. Admittedly, defendant was advised of his constitutional rights *216 before he confessed. But this is not enough because the court cannot:
assume ... that a boy of 15, without aid of counsel, would have a full appreciation of that advice and ... he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. [332 U.S. at 601, 68 S.Ct. at 304].
The court rejects the opinion of the State's psychiatrist that defendant, or any person with the mental age of six- or seven-year-old child, could understand and appreciate Miranda rights and knowingly and intelligently waive them. And when "circumstances cast doubt on the knowing and intelligent quality of the alleged waiver," State v. McCloskey, 90 N.J. 18, 28-29 (1982), the doubt must be resolved in defendant's favor. The State has failed to prove beyond a reasonable doubt that defendant "knowingly and intelligently" waived his Miranda rights because he simply could not understand them. One cannot knowingly and intelligently waive a right that he cannot understand or appreciate. As stated by Justice Brennan in his dissent in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973):
[i]t wholly escapes me how our citizens can meaningfully have said to waive something as precious as a constitutional guarantee without ever being aware of its existence. [412 U.S. at 277, 93 S.Ct. at 2073].
It is true that some uncertainty will arise because persons of diminished mental capacity must be treated differently. It will be asked how is a law enforcement officer to know whether an accused is of a diminished mental capacity? A resolution of this question may not be demonstrably evident in all cases. But it is here. It was evident to the court after briefly hearing and observing defendant testify. Practically every witness, whether lay person or expert, observed a mental deficiency. It should have been obvious to the investigator.
It is not unusual when securing constitutional rights that a court must apply psychological factors which cannot be evaluated with precision or certainty. But a court must nonetheless evaluate such factors. As said by Justice Frankfurter in his *217 concurring opinion in Haley v. State of Ohio, supra, when commenting on when an act may be deemed to be voluntary:
Because of their inherent vagueness the tests by which we are to be guided are most unsatisfactory, but such as they are we must apply them. [332 U.S. at 604, 68 S.Ct. at 306]
For these reasons the confession given by defendant to the prosecutor's investigator shall be suppressed.

CONFESSION TO THE DYFS INVESTIGATOR.
The State sought to circumvent the Miranda problem by offering an oral statement given by defendant two days later, while he was incarcerated in the county jail, to an investigator from DYFS. The nub of the State's argument is that the strictures of Miranda apply only to "custodial interrogation," Miranda v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. at 1612, State v. Graves, 60 N.J. 441, 448 (1972), and a person is not in custody unless restrained or detained, i.e., unable to leave if he wished to, by someone who "possesses law enforcement authority bestowed by some arm of government." State v. Kelly, 113 N.J. Super. 169, 172 (App.Div. 1971), mod. on other grounds 61 N.J. 283 (1972). The State argues that the DYFS investigator was not holding defendant in custody, nor was she acting in any law enforcement capacity or on behalf of any law enforcement agency when the confession was elicited, and therefore, Miranda does not apply.
Defendant does not suggest that interrogation by a governmental agent always creates an inherently compulsive atmosphere which constitutes a custodial atmosphere, but urges that under the circumstances of this case the DYFS investigator, in reality, acted in a law enforcement capacity and constituted an arm of a law enforcement agency because she was required by law to convey to the prosecutor any evidence of a crime involving a child.
The DYFS investigator, who has investigated child neglect and abuse cases for the past 11 years, testified that "as a matter of agency policy" she went to the county jail to interview *218 defendant. The prosecutor's office informed her of the charges and that defendant was incarcerated. Although they did not ask her to interview defendant, she wanted to obtain information which she stated might assist in the treatment of the abused child. She was unaware that the public defender's office had previously filed a notice stating that it represented defendant. She questioned defendant alone in the jail without informing him of his Miranda rights and he confessed. While her office is not an arm of the prosecutor's office, she admitted that it is DYFS policy to refer all cases of suspected child neglect and abuse to the prosecutor's office for investigation and possible prosecution. Indeed, N.J.S.A. 9:6-8.36a requires DYFS to "immediately report all instances of suspected child abuse and neglect ... to the County Prosecutor of the County in which the child resides."
Our inquiry must focus on the role played by the DYFS investigator when she interrogated defendant. Why did she question defendant? While she asserted that one of the reasons was to obtain information to assist in the treatment of the victim, she offered no testimony of what kind of information would be useful to the child's treatment, or how she sought to elicit such information. What she did was to ask defendant to tell her the details of the crime. And what he told her was conveyed to the prosecutor, as required by the statute. This court concludes that the primary purpose for the interview was for DYFS to complete its file of this complaint which, pursuant to the statute, was duly forwarded to the prosecutor to assist in the prosecution of defendant.
No sweeping generalizations can be made of who can be said to possess law enforcement authority and the precise facts of each case must be examined separately. It is not all questioning by a social service worker that will constitute acting in a law enforcement capacity. For instance, "the routine parole interview between a parole officer and parolee" is not because the intent of the parole officer when questioning the parolee is to act "as a guide and counselor to the parolee in his efforts to *219 achieve and maintaining rehabilitation." State v. Davis, 67 N.J. 222, 226 (1975). But when the parole officer goes to a jail to question the parolee about a recent armed robbery such information goes "outside the framework of the parole system" and "implicate[s] defendant's constitutional rights" under Miranda. Id. at 227. The State's reference to State in the Interest of D.G., 174 N.J. Super. 243 (App.Div. 1980) is inapt. There the court denied a father access to DYFS records in a juvenile-in-need-of-supervision (JINS) proceeding only to protect the juvenile's expectations of privacy of her communications to her psychotherapist, not because of any determination that DYFS does not sometimes act in a law enforcement capacity.
A case with remarkable similarity is Mathis v. U.S., 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), where the accused was charged with criminal tax fraud and part of the evidence consisted of documents and oral statements obtained by government agents while defendant was in prison serving a state sentence on an unrelated charge. There too the government sought to escape the application of Miranda on the ground that the information was for other uses, i.e., as part of a routine tax investigation in which no criminal proceedings might even be brought, and because the incarceration was by other governmental officials. But the Supreme Court concluded that these:
differences are too minor and shadowy to justify a departure from the well-considered conclusions of Miranda with reference to warnings to be given to a person held in custody ... [because] tax investigations frequently lead to criminal prosecution ... And as the investigating revenue agent was compelled to admit, there was always the possibility during his investigation that his work would end up in a criminal prosecution. We reject the contention that tax investigations are immune from the Miranda requirements for warnings to be given a person in custody. [88 S.Ct. at 1505]
This court is satisfied that when the DYFS investigator elicited the confession from defendant, the main and primary purpose for questioning him was to obtain information which she knew would be given to the prosecutor. She knew or ought to have known that information concerning the acts constituting the criminal offense were likely to have little beneficial *220 effect in the treatment of the child-victim but would have enormous detrimental effect to defendant in a criminal trial.
Under these circumstances, the conduct of the investigator went "outside the framework" of the purpose and intent for which the interview was held, i.e., to obtain information to assist in the treatment of the child, and clearly "implicated defendant's constitutional rights." In the investigation of child abuse cases there is a very close working relationship between DYFS and the prosecutor's office and at the time she interviewed defendant she was acting in a law enforcement capacity. For these reasons, the confession she received from defendant at the county jail must be suppressed since she failed to inform defendant of his Miranda rights. Of course, even if she had so informed defendant, any confession elicited would confront the same objection to admissibility as did the confession given to the prosecutor's investigator.