**James F. BRADLEY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**George BRITTINGHAM, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted (No. 251, 1987): Oct. 18, 1988.
Submitted (No. 258, 1987): Jan. 4, 1989.
Decided: April 14, 1989.
On Motion for Reargument June 7, 1989.

---

Jerome M. Capone, Wilmington, for appellant Brittingham.

Joseph M. Bernstein, Wilmington, for appellant Bradley.

Loren C. Meyers, Deputy Atty. Gen., Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY, and HOLLAND, JJ.

CHRISTIE, Chief Justice:

This is a consolidated appeal from numerous criminal convictions in Superior Court. The defendants below/appellants, George Brittingham and James F. Bradley, were tried together on various counts of burglary in the third degree, conspiracy in the second degree, felony theft, and misdemeanor theft. A jury in Superior Court found both defendants guilty on all the charges. Thereafter, the trial judge dismissed several of the charges and reduced one theft charge from felony to misdemeanor. Convictions on three counts of burglary in the third degree, one count of conspiracy in the second degree, one count of felony theft, and four counts of misdemeanor theft were allowed to stand. Brittingham was sentenced to a total of eighteen years of imprisonment and Bradley was sentenced to a total of seventeen years of imprisonment on these charges.

The appellants raise several contentions on appeal. Brittingham first contends that the trial court erred in refusing to grant a continuance so that he could attempt to obtain private counsel after it was disclosed that the prosecutor had discovered the results of his polygraph test. Brittingham secondly contends that the failure of the trial court to order severance of the defendants, once it became clear that they were presenting mutually antagonistic defenses, was reversible error. In addition, Bradley contends that his convictions should be reversed on the grounds that the statements he made to an employee of the Department of Correction were admitted in evidence in violation of his fifth and sixth amendment rights.

The evidence presented at trial tended to indicate that on April 23, 1986, at approximately 7 a.m., the Wilmington Police went to an address on Pennsylvania Avenue in Wilmington to investigate a reported burglary of a building containing the offices of five physicians. All of the offices had been broken into, and numerous items were missing.

In their investigation, the police learned that several months before the burglary Brittingham had been employed to do painting and wallpapering inside the building, and while he had been doing this job he had been given the key to the building to enable him to work after regular business hours. A neighbor informed the police that he had seen a dark-colored pickup truck with a white piece of paper on the right front door when its driver was attempting to drive into the building's parking lot via a back alley around midnight on the night the burglaries occurred.

On the basis of this information, the police went to an address on South Harrison Street in Wilmington, which was Brittingham's business office. When the police arrived in that vicinity, they discovered an old red pickup truck. The truck's doors had outlines on them, which indicated that they previously may have had signs on them. The police then knocked on the door of the building. Bradley answered the door. The police asked him who owned the truck. Bradley replied that he and Brittingham owned it.

Bradley agreed to go with the police to the truck and permitted the police to look inside the cab of the truck. While the police searched the truck, Bradley told them that the previous evening he had used the truck to pick up cans along Pennsylvania Avenue. Inside the truck's cab the police found two white magnetic signs and a duffel bag which contained a needle and syringe. The police then arrested Bradley. Bradley was placed in a police car and read his *Miranda* rights. He then indicated that he would not make a statement until he spoke with an attorney.

The police secured the premises and went to obtain a search warrant for the building. By the time the police obtained the search warrant, Brittingham had arrived at the property. The police searched the premises, and in the building's basement they found property which had been taken from the physicians' offices. Brittingham was placed under arrest, taken to the police station and read his *Miranda* rights, and then questioned by the police.

Brittingham told the police that he had spent the previous evening in the South Harrison Street building with two of his children, and that Bradley had driven the truck that night. He stated that on the morning of April 23, Bradley woke him up and said that he had found various items in garbage bags in a dumpster. Although initially Brittingham denied he had any knowledge of the contents of the bags, eventually he stated that he may have helped carry some of the bags into the building, and that he knew some of the contents of the bags.

Bradley and Brittingham were both incarcerated at Gander Hill Multiple Purpose Criminal Justice Center ("Gander Hill") while they awaited trial as codefendants. At the trial, Bradley testified that he had the pickup truck on the evening of April 22, 1986, and he had used the truck to collect cans which he sold for scrap. He said that he left the truck at the South Harrison Street business office around 10:00 or 10:30 p.m. He stated that he then got into his own car with another man and drove to the San Marco, a local restaurant and bar, where he stayed until about 2 a.m., when it closed for the night. Bradley said that he then drove to Steve's Tavern, where he spoke with an acquaintance in the parking lot, and then he left to go to the home of his sister and brother-in-law in Newark, Delaware, where he was residing.

Bradley further testified that at around 7:30 a.m. he went to work at the South Harrison Street office. He went inside the office and found Brittingham there with his two children and an employee. Bradley stated that Brittingham gave him a strongbox filled with coins and told him to count the money in it, then cash it in at a bank and use the money to purchase paint. Bradley testified that Brittingham then left to take his children to school and his employee to work. Shortly thereafter, the police knocked on the door and began to question Bradley about the red pickup truck.

After Bradley testified, he called Robert Hake as a defense witness. Hake was housed in the same "pod" at Gander Hill with Brittingham from the latter part of June through part of August, 1986. Hake testified that Brittingham had told him that Bradley did not have anything to do with the burglary, and that Bradley's only connection to the incident was that he happened to be at the office when the police arrived. On cross-examination Hake elaborated and stated that Brittingham said he had committed the burglary by himself.

Later Brittingham testified in his own defense. He stated that on the evening of the burglary at about 11 p.m., while he was out driving with his sister, he saw Bradley driving the truck. Brittingham said he then took his sister home, and when he returned to his office the truck was still not back. He then went to sleep. Brittingham stated that the following morning around 5:30 a.m. he was awakened by Bradley. He said that Bradley had already brought bags, which turned out to contain the stolen property, into his office. Brittingham testified that Bradley told him he had found the bags in the dumpster. Brittingham stated that he had some doubt concerning whether Bradley was telling the truth about the bags, and that when he left his office to drop off his son and employee he told Bradley to get the bags out of his place.

As part of his defense Brittingham called Robert Kramer to the stand. Kramer was an employee of the Department of Correction who served as Director of Pre–Release Services at Gander Hill. Kramer testified concerning statements Bradley made to him during the course of a "preliminary hearing" Kramer had conducted to determine whether there was probable cause to believe that Brittingham had violated the conditions of his conditional release to which he was subject at the time of the burglary. In the statements Bradley made to Kramer, he tended to incriminate himself and exculpate Brittingham. Most notably, Bradley told Kramer that he had brought all the property contained in the bags into the South Harrison Street office unbeknownst to Brittingham.

Brittingham also called his sister, Rachel Brittingham, to the stand. She testified that on the night of the burglary, she was in a car with her brother and she saw Bradley driving the pickup truck after 11 p.m.

On appeal, Brittingham raises two contentions. His first contention is that he should have been granted a pretrial continuance so that he could attempt to obtain new counsel. This contention centers around an incident concerning the results of a polygraph examination he took. Early in the afternoon the day before Brittingham's trial was to commence, Brittingham's attorney, David Lukoff, a public defender, and the prosecutor in the case, Timothy Barron, entered into an agreement. The agreement provided that if that afternoon Brittingham passed a polygraph examination showing that he was not involved with the burglary he would be allowed to plead guilty to receiving stolen property and in return the State would enter *nolle prosequis* as to the other charges. Barron asked to be informed of the polygraph results later that afternoon, so he could prepare for trial. At 4:15 that afternoon Barron telephoned Lukoff to ascertain whether Brittingham had passed the polygraph test. Lukoff's secretary informed Barron that Lukoff had left the office for the day. Barron then asked Lukoff's secretary whether she knew the test results. She replied that she did not.

Barron then decided to call the man who had administered the test to discover the test results. This man was an employee of the Public Defender's Office, and he asked Barron if revealing the results would be acceptable to Lukoff. Barron replied that he was "sure it would [be], having every belief in the world that it would have been okay." Barron was then informed of:

the three basic questions [which Brittingham was asked] and the results of those three basic questions. Question 1 being, "Did you participate—did you burglarize the doctors' offices"; answer: "No." In the opinion of Mr. Smith, a truthful response. Second question, "Did you aid in the planning of the burglary?" ... Answer: "No." The opinion of the examiner, obviously deception. Three, "Did you or another within your knowledge commit the burglary?" Answer: "No." Obvious deception was the conclusion of the polygraph examiner.

When Lukoff learned that this information had been revealed to the prosecution,

he made a pretrial motion to withdraw from the case and have the trial continued so Brittingham could attempt to hire private counsel. Lukoff stated that because of the incident he was "now representing a guy who believes our office has violated the ethical code." Moreover, Lukoff contended that the prosecutor had obtained valuable information by finding out the precise phrasing of the questions Brittingham was asked.

The trial court denied the defense motion. The court stated that on the previous day Brittingham had likewise attempted to have the trial continued so that he could *attempt* to attain private counsel and that this motion was denied because it was made too near the time of trial. The court also noted that the prosecutor had not intentionally attempted to gain privileged information, and that even if the prosecutor had acted improperly there had been no prejudice to the defendant.

■ On appeal, the defendant contends that the trial court's refusal to permit him an opportunity to obtain new counsel after the polygraph incident denied him his sixth amendment right to counsel. The defendant contends that he was harmed when the prosecutor learned the results of the polygraph examination because he had a stronger prosecution case to overcome, and he was represented by an attorney he could not trust. We find no merit in defendant's contentions.

We first note that the defendant does not claim, and there is no evidence to suggest, that the prosecutor's actions were malicious or deceitful. His offer of a favorable plea bargain if the defendant passed a polygraph examination could only redound to the defendant's benefit. The prosecutor had a legitimate need to know the outcome of the polygraph examination the day before the trial since it would affect his preparation for the case. Moreover, he first attempted to obtain the result from Lukoff.

The problem with the polygraph examination agreement is that Barron and Lukoff left it ambiguous as to precisely how and what Barron would learn about its results. At the very least, as the trial court noted, the prosecutor would have been told that there would be no plea agreement and thus learned that Brittingham had failed the examination. The defendant, however, contends that when the prosecutor learned the precise phrasing of the questions together with his replies, he discovered significant additional information concerning the case.

There is no basis in the record for this contention. The results of the polygraph examination were not introduced at trial. In addition, no evidence presented at trial was obtained because of what the prosecutor learned about the polygraph examination. Similarly, Brittingham does not claim that the prosecutor discovered anything about his defense strategy or trial preparation.

Brittingham simply contends that after the prosecutor learned of his answers to the three questions he was able to concentrate on trying him on a theory of accomplice liability. The prosecutor, however, told the trial judge that this was already his theory concerning the case. The trial judge accepted this and held that assuming, *arguendo*, what the prosecutor did was a violation, no prejudice resulted from it.

We review such a determination of fact under a clearly erroneous standard of review. *State v. Rooks*, Del.Supr., 401 A.2d 943, 949 (1979); *see also United States v. Costanzo*, 3d Cir., 740 F.2d 251, 255 (1984). The information known to the prosecutor before he learned about the polygraph examination supported a theory of accomplice liability. This information included the fact that Brittingham at one time had been given possession of a key to the premises while Bradley alone had driven the pickup truck near the site of the burglary on the night of the crime. Brittingham, on the other hand, does not identify any information which the prosecutor could only have learned from the polygraph results. We,

therefore, do not disturb the finding of the trial court that the disclosure did not prejudice the defendant.

■ As for the defendant's request for a continuance so he could attempt to obtain private counsel, this Court has held that "[t]he denial of a continuance for change of counsel on the eve of trial is not an abuse of discretion when: (1) there had been no previous complaint about counsel; (2) defendant had a prior opportunity to obtain substitute counsel; and (3) obtaining substitute counsel was uncertain and appeared to be a dilatory tactic." *Riley v. State*, Del.Supr., 496 A.2d 997, 1018 (1985) (*en banc*), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). Prior to the defendant's request for a continuance to seek a change of counsel on the day of trial, his only other request came the previous day. The trial court denied both the requests using the factors mentioned in the *Riley* case. Brittingham makes no contention that Lukoff did anything that gave Brittingham any reasonable ground not to trust him other than his harmless failure to prevent the prosecution from finding out about the results of the polygraph examination. This Court has repeatedly held that a discretionary ruling on a motion for continuance will not be disturbed unless the ruling is based on grounds that are clearly unreasonable or capricious. *See, e.g., Hicks v. State*, Del.Supr., 434 A.2d 377, 381 (1981) (*en banc*). We find that under the facts of this case, the trial court did not abuse its discretion.

■ Brittingham's second contention is that the trial judge committed reversible error by failing to sever his trial from that of his codefendant on the ground that their defenses were mutually antagonistic.

At a pretrial hearing, Brittingham's attorney made a motion to sever the trials of the two defendants. He based this motion on his belief that the statements that Bradley made to Kramer, which partially exculpated Brittingham, might not be admissible at a joint trial under existing case law. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In addition, Brittingham's attorney noted that if the statements were admissible Bradley might deny making them. Brittingham's attorney stated that "the more we move into it, the more it seems ... trying these [two defendants] together is going to be more difficult than initially it appeared, and I would add that as a grounds for a motion to sever." The trial judge denied the motion to sever, stating that it was based on a potential *Bruton* problem that might not occur at trial.[1]

While the trial judge thus had notice that there were potential conflicts between the codefendants, no specific mention was made in the trial court of the need for a severance due to antagonistic defenses. Although this contention was not raised at the trial level, we find that the interests of justice require that we review the failure of the trial judge to sever the trials of the codefendants after it became clear that the defenses were importantly antagonistic. Supr.Ct.R. 8.

Superior Court Criminal Rule 8(b) states that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction ... constituting an offense or offenses." The rule of joinder "is designed to promote judicial economy and efficiency, provided that the realization of those objectives is consistent

---

1. The trial judge ruled that if the State made an application to use a statement, the admissibility of the statement would be considered and the statement would be redacted or excluded if necessary, but that unless such an application was made no statement of either codefendant would be admissible in the State's case-in-chief. This careful approach made it clear that any *Bruton* problem arising in the State's case-in-chief would have received careful attention. Since it turned out that both defendants chose to testify at trial, no *Bruton* problem arose. *See Bruton v. United States*, 391 U.S. at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. It has been observed, however, that in general, the best corrective measure available to a trial court when a true *Bruton* issue does arise is a severance. *See* Garcia, *The Winding Path of Bruton v. United States: A Case of Doctrinal Inconsistency*, 26 Am.Crim.L. Rev. 401, 412–13 (1988).

with the rights of the accused." *Sexton v. State*, Del.Supr., 397 A.2d 540, 545 (1979) (quoting *Mayer v. State*, Del.Supr., 320 A.2d 713, 717 (1974)).

■ The general rule, therefore, is that defendants who are indicted jointly should be tried together. *Jenkins v. State*, Del. Supr., 230 A.2d 262, 272 (1967). However, Superior Court Criminal Rule 14 provides an exception to this general rule. It states that if a defendant is prejudiced by this joinder, the trial court may "grant a severance of defendants."[2] Super.Ct.Crim.R. 14. The rule allows the court to order a severance *sua sponte*.

■ The decision to grant or deny severance is a matter within the sound discretion of the trial court. *Wiest v. State*, Del. Supr., 542 A.2d 1193, 1195 (1988); *Younger v. State*, Del.Supr., 496 A.2d 546, 549–50 (1985). We have held that "[w]hile abuse of discretion usually depends upon the facts and circumstances of each case, as a general rule it may be said that discretion has been abused by denial when there is a reasonable probability that substantial injustice may result from a joint trial." *Bates v. State*, Del.Supr., 386 A.2d 1139, 1141 (1978).

■ Antagonistic defenses between codefendants is a factor to be considered when determining whether severance should be granted. *Jenkins v. State*, 230 A.2d at 273. However, it is clear that the presence of hostility between a defendant and his codefendant or "mere inconsistencies in defenses or trial strategies" do not require a severance. Annotation, *Antagonistic Defenses as Ground for Separate Trials of Codefendants in Criminal Case*, 82 A.L.R.3d § 2, at 250 (1978). Similarly, a defendant is not entitled to a separate trial

simply because he might then stand a better chance of being acquitted. 8 J. Moore, *Moore's Federal Practice* ¶ 14.04[1], at 14–25 (2nd ed. 1989). When, on the other hand, "the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant, the defenses are sufficiently antagonistic to mandate separate trials." *State v. Vinal*, Conn.Supr., 504 A.2d 1364, 1368 (1986). *See also Smith v. Kelso*, 11th Cir., 863 F.2d 1564, 1568 (1989); *United States v. Romanello*, 5th Cir., 726 F.2d 173, 177 (1984).

In this case each defendant presented an alibi defense. Their two defenses as they unfolded in this case were so antagonistic that the jury could not accept one defendant's defense without rejecting a central part of the other defendant's defense. Moreover, throughout the trial, the jury was witness to repeated attempts by each defendant to incriminate the other. A fair trial is not possible under these circumstances, and a severance should have been granted.

The State contends that the two defenses of the codefendants were not mutually exclusive because the essence of each defendant's defense was that he did not plan or perpetuate the burglary. However, a careful examination of what occurred during the trial belies the validity of this view.

At trial each defendant introduced evidence that strongly incriminated his codefendant. *See State v. Vinal*, 504 A.2d at 1367. Most notably, each defendant called a witness—Kramer (for Brittingham) and Hake (for Bradley)—who testified that the other defendant had confessed to him that he alone was responsible for the presence of the stolen goods in Brittingham's office.

---

2. Superior Court Criminal Rule 14 provides:

If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or

provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the Court may order the attorney for the State to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the State intends to introduce in evidence at the trial.

This information, which was in turn extremely damaging to each defendant, was not presented by the State in its case-in-chief.

Moreover, on the witness stand, each defendant gave a different version of an incident that went to the core of his codefendant's defense. *See Jenkins v. State*, 230 A.2d at 273. Bradley stated that on the night of the burglary he could not have committed the crime because he had returned the pickup truck to the South Harrison Street office by 10:30 p.m. Brittingham, however, testified that he saw Bradley driving the truck that night after 11 p.m. (Brittingham also called his sister to the stand to testify to the same effect.) Conversely, although Brittingham testified that he was awakened early the next morning when Bradley brought the bags which contained the stolen items into his office, Bradley testified that he never had anything to do with the stolen items. Each defendant thus discredited a key incident in his codefendant's alibi.

Finally, during their closing arguments each defendant's attorney discredited the other defendant's defense and insinuated that the codefendant was responsible for the burglary. Although a closing argument is not evidence, what is said during it may create an antagonistic defense. *See United States v. Gonzalez*, 11th Cir., 804 F.2d 691, 695–96 (1986); *United States v. Romanello*, 726 F.2d at 178–79.

Thus, throughout the trial each defendant was in the position of continually having to oppose and discredit his codefendant. The prosecutor described the degree of antagonism between the two defenses in his closing summation:

> Bradley, I guess, the sum and substance of his testimony is, his defense, don't look at me, it's Brittingham. Brittingham, the sum and substance of his testimony is, hey, don't look at me; it's Bradley.

Under our system of justice, it is incumbent upon the State to prove beyond a reasonable doubt the guilt of each defendant. It is not proper, therefore, to hold a trial which in many aspects becomes more of a contest between the defendants themselves than between each defendant and the State. *See e.g., People v. Daugherty*, 102 Ill.2d 533, 82 Ill.Dec. 315, 317, 468 N.E.2d 969, 973, 975 (1984). When it became evident during the course of the trial that the defendants' defenses were so mutually antagonistic that a jury could not reasonably believe either one without rejecting the other, the trial court should have granted severance *sua sponte*. Super.Ct.Crim.R. 14. Although Bradley did not raise this issue on appeal, his defense was as prejudiced by the joint trial as Brittingham's was. When defendants' defenses are mutually antagonistic to the extent they were in this case, the demands of justice require that the defendants must be tried separately. Under these circumstances, we believe that the interests of justice require both defendants to be treated alike. We hold, therefore, that the trial court erred in failing to grant the codefendants a severance in this case. The resulting convictions must be reversed, and the case remanded for new separate trials.

\*     \*     \*

It is possible that Bradley's claim that the use of statements he gave to Kramer, a State employee, violated his rights under the fifth and sixth amendments will arise again at retrial, and for that reason we will discuss this contention for the guidance of the Superior Court. *See Getz v. State*, Del.Supr., 538 A.2d 726, 735 (1988); *see also State v. Vinal*, 504 A.2d at 1368–69.

At the trial, Kramer had testified that on June 10, 1986, he had conducted a so-called preliminary hearing to determine whether there was probable cause to hold that Brittingham had violated two of the conditions of his conditional release. Brittingham's parole officer, Rudy Coleman, had lodged a warrant against Brittingham, charging that Brittingham had possessed a firearm without permission and that he had failed to report his arrest. As Director of Pre-Release Services at Gander Hill, Kramer's

duties included supervising human service workers and parole and probation officers. He also conducted preliminary hearings as to alleged violations of the terms of conditional releases. Brittingham's preliminary hearing was conducted in the pod where Brittingham was being held.

At that hearing, Brittingham told Kramer that the firearm in question was among the property the police seized at the time of his arrest. Brittingham then stated that he had not known that the weapon was in his office, and that he was not responsible for it or for the items among which it was found. Brittingham further indicated that Bradley would support his version of the facts.

It was then that Kramer and Coleman went to the pod where Bradley was being held. By that time, Kramer was aware that Bradley and Brittingham were codefendants in pending criminal proceedings and that each man had been arrested on the same charges.

When Kramer and Coleman arrived at the pod where Bradley was held, they were met by a correction officer who escorted them to a hallway just outside of the pod. As Kramer, Coleman, and the correction officer approached Bradley, Kramer testified that he was aware that, if Bradley spoke with him, Bradley might give incriminating responses. Kramer also stated that he knew that it was possible that anything Bradley told him might later be used against Bradley. Kramer stated that he considered giving *Miranda* warnings to Bradley but decided not to. Kramer said he felt that since he was acting as a magistrate, in an adjudicatory, rather than an investigatory, capacity, there was no requirement that he give Bradley *Miranda* warnings at that time. *See generally*, Annotation, *Admissibility, in State Probation Revocation Proceedings, of Incriminating Statement Obtained in Violation of Miranda Rule*, 77 A.L.R.3d §§ 2–4, at 671 (1977). Kramer also stated that at the end of a preliminary hearing he would make a report to the Parole Board, and in the ordinary course of events the Attorney General would not have knowledge of this report.

Kramer testified that while in the hallway he told Bradley that Brittingham had requested that he testify in his behalf. Kramer stated he informed Bradley that the decision of whether to testify for Brittingham was up to him, and that his testimony was not mandatory. Kramer testified that he did not inform Bradley that he had the right to consult a lawyer and, in fact, he stated that Bradley did not have the opportunity to consult a lawyer. Kramer also said that he did not tell Bradley that anything he said could be used against him in court.

Kramer testified that Bradley replied that he was willing to testify. At this point Kramer, Coleman, and Bradley went into an interview room. The room was divided by a Plexiglas panel that had a small opening through which it was possible to converse. The interview was conducted with Bradley on one side of the panel and Kramer and Coleman the other.

Kramer testified that he told Bradley that one of the charges against Brittingham was that he had possessed a firearm, and he informed Bradley that Brittingham had stated that: a) he had no idea that the firearm, or any of the stolen property, was in the South Harrison Street office, and b) Bradley would support his story.

Kramer testified that Bradley did support Brittingham's story by stating that unbeknownst to Brittingham, he, Bradley, had brought all the property into the office. It is this verbal exchange which Bradley contends was erroneously admitted into evidence and used against him at his trial.

The fifth amendment, made applicable to the states through the fourteenth amendment, provides, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." This prohibition allows a person to refuse to testify against himself when he is a defendant in a criminal trial and also "privi-

leges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409, 418 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973)).

The basic rule regarding the protection the fifth amendment affords "is that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Minnesota v. Murphy,* 465 U.S. at 429, 104 S.Ct. at 1143, 79 L.Ed.2d at 420. There are, however, several limited exceptions to the general rule that a person must invoke the fifth amendment to be afforded its protection.

A pertinent exception to the general rule concerns statements which are obtained by the government during custodial interrogation. In the case of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The Supreme Court stated that in a custodial interrogation situation "[p]rior to any

questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. The Supreme Court held that when custodial interrogation occurs "[a]n individual need not make a pre-interrogation request for a lawyer.... No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given." *Id.* at 470, 86 S.Ct. at 1626, 16 L.Ed.2d at 721.

Since the initial ruling in the *Miranda* case, the Supreme Court has made clear that it is necessary to give the *Miranda* rights only in "the context of the inherently coercive custodial interrogations for which it was designed." *Roberts v. United States,* 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622, 631 (1980); *see also Minnesota v. Murphy,* 465 U.S. at 430, 104 S.Ct. at 1144, 79 L.Ed.2d at 421.

■ The language of the *Miranda* opinion, which states that the *Miranda* rights must be stated to someone the authorities wish to question after he has been "taken into custody" implies that any questioning of a prisoner constitutes custodial interrogation.[3] 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. *Cf. Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1101 (*en banc*), *cert. denied,* 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986).

■ It is evident that Kramer and Coleman were State officials. They enjoyed the privilege of authority: when they desired to see Bradley they were immediately able

---

**3.** The only instance when courts have permitted a person to be questioned in prison without receiving his *Miranda* warnings is when the questioning is part of an on-the-scene investigation involving a prison crime. *See, e.g., United States v. Conley,* 4th Cir., 779 F.2d 970, 972–73 (1985), *cert. denied,* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986); *Cervantes v. Walker,* 9th Cir., 589 F.2d 424, 427 (1978). *See also Miranda*

*v. Arizona,* 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725 (holding that *Miranda* warnings are not required for "[g]eneral on-the-scene questioning as to facts surrounding a crime"). This case does not concern an on-the-scene questioning concerning a prison crime. In this case, the crimes occurred before Bradley was incarcerated.

to do so, without advance notice, and were escorted to the hallway where Bradley was by a correction officer. Thus, the statements Bradley made in response to their questioning were not the result of a chance encounter or casual conversation, but instead came about due to a planned, concerted effort. Under the totality of the circumstances, there is no sound policy reason not to conclude that this questioning in prison constituted custodial interrogation. We hold that Bradley was in custody within the meaning of the *Miranda* rulings when he was questioned.

It is also evident that Kramer and Coleman qualify as government agents to whom the *Miranda* case was directed. Although they were not prison guards or prosecutors, the United States Supreme Court has not restricted the applicability of the *Miranda* safeguards to State employees with specific titles or duties. In the case of *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the United States Supreme Court held that the *Miranda* rules regarding custodial questioning applied to questions an agent of the Internal Revenue Service put to someone who was imprisoned on a different matter. *Mathis v. United States*, 391 U.S. at 5, 88 S.Ct. at 1505, 20 L.Ed.2d at 385. Similarly, in the case of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court held that the *Miranda* case covered statements given to a court designated psychiatrist who examined a defendant in prison without informing him of his *Miranda* rights. *Estelle v. Smith*, 451 at 468, 101 S.Ct. at 1875–76, 68 L.Ed.2d at 372. The *Smith* Court stated that the fact "[t]hat respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial." *Id.* at 467, 101 S.Ct. at 1875, 68 L.Ed.2d at 372.

Other courts have similarly held that a wide range of State employees are required to give *Miranda* warnings to someone held in custody whom they question. *See, e.g., United States v. Mata–Abundiz*, 9th Cir., 717 F.2d 1277, 1280 (1983) (Immigration and Naturalization worker); *State v. Thompson*, Wis.Ct.App., 419 N.W.2d 564, 568 (1987), *pet. for rev. denied*, 143 Wis.2d 911, 422 N.W.2d 860 (1988) (parole officer); *Commonwealth v. Ramos*, 367 Pa.Super. 84, 532 A.2d 465, 468 (1987) (Children and Youth Services caseworker); *State v. Flower*, 224 N.J.Super. 208, 539 A.2d 1284, 1289–90, (1987), *aff'd*, 224 N.J.Super. 90, 539 A.2d 1223 (1988) (Division of Youth and Family Services official); *Commonwealth v. Palm*, 315 Pa.Super. 377, 462 A.2d 243, 249–50 (1983) (game protector).

In this case, Kramer and Coleman were clearly acting in their respective capacities as Director of Pre–Release Services and parole officer. They hoped to question Bradley concerning a crime Bradley was charged with having committed. Under these circumstances, we conclude that Kramer and Coleman were acting as State agents, and their conduct implicated Bradley's constitutional rights under the *Miranda* decision.

The final question "here, as in other contexts, turns on whether there was 'interrogation' within the meaning of *Miranda*." *United States v. Mata–Abundiz*, 717 F.2d at 1279. It is evident from Kramer's testimony on *voir dire* that Kramer and Coleman were not acting as agents of the prosecution, but rather were attempting to obtain information for what amounted to a parole violation hearing. Even though Kramer was acting in an adjudicatory proceeding, he testified that he knew Bradley was Brittingham's codefendant and that he realized that the questions he asked Bradley might elicit an incriminating response. Under these circumstances, we believe that the interview with Bradley constituted interrogation within the meaning of *Miranda*. Although there are differences between the facts of this case and those in the *Miranda* case, as the Supreme Court stated in the *Mathis* case (another case where a prisoner was questioned by a non-prosecutorial government agent), "[t]hese

differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." 391 U.S. at 4, 88 S.Ct. at 1504–05, 20 L.Ed.2d at 384.

■ As previously noted, in the *Miranda* case, the Supreme Court required that before a person in custody was questioned "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. In this case, Bradley was advised of only the first of his three basic rights—his right to remain silent. Although Kramer was aware that Bradley might incriminate himself he neither informed him that his statements could be used against him nor advised him of his right to have an attorney present. Without these specific warnings, or their functional equivalent, the defendant is deemed to have been unaware of the consequences of his agreement to answer questions and, thus, was unable to make an informed waiver of his fifth amendment right to refrain from testifying against himself. *See Howard v. State*, Del.Supr., 458 A.2d 1180, 1183 (1983). In the *Miranda* case, the Supreme Court stated that "[t]he warnings required and the waiver necessary . . . are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. Since Bradley was not afforded the requisite warning before the custodial questioning, it is an error of constitutional significance to admit Bradley's statements to Kramer into evidence where they would be used against him at trial. On remand, Bradley's prior testimony relating to his statements to Kramer may not be used against him, and Bradley's statements to Kramer may not be used against him in the prosecution's case-in-chief. *See Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

NOW, THEREFORE, IT IS ORDERED that the judgments of the Superior Court resulting in the convictions of Brittingham and Bradley are REVERSED, and the case is REMANDED so that each defendant may be tried on the charges separately.

## ON MOTION FOR REARGUMENT

This 7th day of June, 1989, the Court has before it the State's motion for reargument. The State contends that this Court erred in remanding the *Brittingham* case to Superior Court on account of the failure by that court to sever *sua sponte* the trial of the codefendant who presented antagonistic defenses.

■ The State contends that the trial judge's duty to avoid improper joinder "is properly exercised only on a defendant's request." However, the only case the State cites in support of this proposition, *United States v. Vida*, 370 F.2d 759 (6th Cir.1966), *cert. denied*, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630 (1967), does not support the State's contention.

■ The State also contends that if a trial court were to grant severance *sua sponte*, this action might prevent a retrial of the defendant. In support of this position the State cites *dicta* contained in a footnote in the case of *Willis v. Kemp*, 838 F.2d 1510 (11th Cir.1988), which states that if a trial court *sua sponte* grants a defendant a mistrial because of prosecutorial misconduct "this *may* operate to acquit the defendant." *Id.* at 1519–20 n. 19 (emphasis added). "Prosecutorial misconduct" is not involved here. Furthermore, although the question of whether double jeopardy is involved must be addressed on a case-by-case basis, in a different factual situation this Court has found that if "manifest necessity" required a trial court judge to declare a mistrial *sua sponte*, the defendant could be retried. *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1075–78 (1987).

The State also contends that the failure to order severance did not prejudice either defendant and that this Court "has overlooked the reality that the same evidence admitted in the joint trial is admissible in each separate trial." However, the State's contention that Bradley's statements to Kramer may be used by the State in Bradley's new trial is speculative. Bradley's statements to Kramer may not be used in a

new trial unless Bradley testifies, *Miranda v. Arizona, supra,* and he may choose not to testify. U.S. Const.Amend. V. Moreover, even if Bradley does choose to testify, his prior statements could be used only to impeach his testimony. *Harris v. New York, supra.*

In addition, as this Court pointed out in its opinion, the joint trial causes each defendant to suffer other forms of prejudice. Specifically, the core of each defendant's defense could only be accepted by the jury if it rejected the core of his codefendant's defense, and each defendant's counsel strongly discredited the other defendant in his closing remarks. Under these circumstances, as the Court indicated, separate trials should have taken place.